**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VÄLINGE INNOVATION AB, | |
| Plaintiff, | C.A. No. 16-1082-LPS-CJB |
| v. | REDACTED -- PUBLIC VERSION |
| HALSTEAD NEW ENGLAND CORP. and HOME DEPOT U.S.A., INC., | |
| Defendants. | |

**PLAINTIFF VÄLINGE INNOVATION AB'S ANSWERING BRIEF IN RESPONSE TO
DEFENDANTS' COMBINED MOTION FOR SUMMARY JUDGMENT
AND TO EXCLUDE EXPERT TESTIMONY**

Dated: January 24, 2019

OF COUNSEL

Laura Masurovsky
Jason L. Romrell
Sydney Kestle
Finnegan, Henderson, Farabow,
 Garrett & Dunner, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000
laura.masurovsky@finnegan.com

Daniel C. Cooley
Finnegan, Henderson, Farabow,
 Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive, Suite 800
Reston, VA 20190-5675
(571) 203-2700
daniel.cooley@finnegan.com

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 N. King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiff
Välinge Innovation AB*

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTS AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTIONS
        FOR SUMMARY JUDGMENT........................................................................................ 1

        A.      Summary Judgment of Non-Infringement for the '499 Patent Is Improper .......... 1

        B.      Summary Judgment of Non-Infringement for the '899 Patent Is Improper .......... 8

        C.      Välinge's Contributory and Inducement Claims Are Well Founded.................... 14

        D.      Summary Judgment of Non-Infringement for the '581 Patent Is Improper ........ 15

        E.      Summary Judgment of Non-Infringement for the '625 Patent Is Improper ........ 17

        F.      Summary Judgment of Non-Infringement for the '423 Patent Is Improper ........ 23

        G.      Summary Judgment of Invalidity of the '499 Patent Should Be Denied.............. 29

                1.      Hannig '238 Does Not Anticipate Independent Claims 1 and 30............. 29

                        a.      Hannig '238 does not disclose "resilient floorboards" ................ 29

                        b.      Hannig '238 does not disclose the "bending" limitation ............. 34

                2.      Hannig '238 Does Not Anticipate the Additional Limitations in
                        Dependent Claims 4, 9, 10, and 33 of the '499 Patent............................. 35

                        a.      Dependent claims 4 and 33 ........................................................ 35

                        b.      Dependent claim 9 ..................................................................... 35

                        c.      Dependent claim 10 ................................................................... 37

        H.      Subjective Willfulness Is for the Jury to Determine, and If Found, Only
                Then Does This Court Decide Whether Enhancement Is Warranted .................. 38

III.    FACTS AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTIONS
        TO EXCLUDE EXPERT TESTIMONY ......................................................................... 42

        A.      Per Nygren's Anticipated Expert Testimony Is Reliable and Based on
                Välinge's Real-World Apportionment................................................................. 42

        B.      Justin McLean's Methodologies—Including His Conservative Analysis of
                the Distribution of Value in Välinge's Patent Portfolio—Are All Tied to
                the Facts of This Case ........................................................................................ 46

i

IV.    CONCLUSION.................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
  694 F.3d 1312 (Fed. Cir. 2012)..................................................................................46

*Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*,
  265 F.3d 1294 (Fed. Cir. 2001)..................................................................................42

*AllVoice Comput. PLC v. Nuance Commc'ns, Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007)..................................................................................34

*AVM Technologies, LLC v. Intel Corp.*,
  No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013)....................................46

*C & C Jewelry Mfg., Inc. v. West*,
  No. C09-01303 JF (HRL), 2011 WL 2433817 (N.D. Cal. June 13, 2011)...........40

*Coca-Cola Co. v. Pepsico, Inc.*,
  No. 1:02-CV-2887-RWS, 2005 WL 5974444 (N.D. Ga. Mar. 17, 2005) .............40

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
  809 F.3d 1295 (Fed. Cir. 2015)..................................................................................42

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)....................................................................................................47

*Eaton Corp. v. Rockwell Int'l Corp.*,
  323 F.3d 1332 (Fed. Cir. 2003)..................................................................................30

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009), *amended on reh'g in part*, 366 F. App'x 154
  (Fed. Cir. 2009)..........................................................................................................12

*Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*,
  No. 2:15-cv-00011-RSP, 2018 WL 2149736 (E.D. Tex. May 10, 2018)..............42

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312 (Fed. Cir. 2015)............................................................................22-23

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018)..................................................................................39

*Finjan, Inc. v. Sophos, Inc.*,
  No. 14-cv-01197-WHO, 2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) .............43

*Gen. Elec. Co. v. Nintendo Co.*,
    179 F.3d 1350 (Fed. Cir. 1999)......................................................................................31

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
    45 F.3d 1550 (Fed. Cir. 1995).......................................................................................29

*Gustafson, Inc. v. Intersys. Indus. Prods., Inc.*,
    897 F.2d 508 (Fed. Cir. 1990).......................................................................................40

*Halo Electronics, Inc. v. Pulse Electronics, Inc.*,
    136 S. Ct. 1923 (2016)...........................................................................................38, 39

*Helifix Ltd. v. Blok-Lok, Ltd.*,
    208 F.3d 1339 (Fed. Cir. 2000).................................................................................29, 35

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) ......................................50

*In re Innovatio IP Ventures, LLC Patent Litig.*,
    MDL No. 2303, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)....................................49

*Intel Corp. v. Future Link Sys., LLC*,
    268 F. Supp. 3d 605 (D. Del. 2017)..............................................................................17

*Jurgens v. McKasy*,
    927 F.2d 1552 (Fed. Cir. 1991).....................................................................................40

*Kaufman Co. v. Lantech, Inc.*,
    807 F.2d 970 (Fed. Cir. 1986).......................................................................................41

*LG Display Co. v. AU Optronics Corp.*,
    722 F. Supp. 2d 466 (D. Del. 2010)..............................................................................49

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).....................................................................................44

*Mass Engineered Design, Inc. v. Planar Sys., Inc.*,
    No. 3:16-cv-1510-SI, 2018 WL 3323762 (D. Or. July 6, 2018)................................40

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017).....................................................................................41

*N. Telecom, Inc. v. Datapoint Corp.*,
    908 F.2d 931 (Fed. Cir. 1990).......................................................................................19

*Net MoneyIN, Inc. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)............................................................................. 36-37

*Odyssey Wireless, Inc. v. Apple Inc.*,
No. 15-cv-01735-H-RBB, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ............................49

*Oracle Am., Inc. v. Google Inc.*,
No. C 10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) ....................................48

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
575 F.2d 1152 (6th Cir. 1978) .............................................................................................43

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
182 F.3d 1298 (Fed. Cir. 1999).....................................................................................29, 30

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
383 F.3d 1303 (Fed. Cir. 2004).............................................................................................31

*Proveris Sci. Corp. v. Innovasystems, Inc.*,
739 F.3d 1367 (Fed. Cir. 2014).............................................................................................30

*PSN Ill., LLC v. Ivoclar Vivadent, Inc.*,
525 F.3d 1159 (Fed. Cir. 2008).............................................................................................34

*Radio Steel & Mfg. Co. v. MTD Prods., Inc.*,
731 F.2d 840 (Fed. Cir. 1984)...............................................................................................19

*Richardson v. Suzuki Motor Co.*,
868 F.2d 1226 (Fed. Cir. 1989)........................................................................................38-39

*Sprint Commc'ns Co. v. Time Warner Cable, Inc.*,
No. 2017-2247, 2018 WL 6266319 (Fed. Cir. Nov. 30, 2018) .............................................46

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)......................................................................................46, 47

*SunTiger, Inc. v. Sci. Research Funding Grp.*,
189 F.3d 1327 (Fed. Cir. 1999).............................................................................................17

*Transclean Corp. v. Bridgewood Servs., Inc.*,
290 F.3d 1364 (Fed. Cir. 2002).............................................................................................29

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011).............................................................................................45

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
837 F.3d 1358 (Fed. Cir. 2016).............................................................................................39

*Xerox Corp. v. 3Com Corp.*,
458 F.3d 1310 (Fed. Cir. 2006)......................................................................................29, 35

*Zimmer Surgical, Inc. v. Stryker Corp.*,
   No. 16-679-RGA-MPT, 2017 WL 3736750 (D. Del. Aug. 30, 2017)....................................41

**Other Authorities**

ISOCORE installation video, https://www.youtube.com/watch?v=eqvQiA7u254........................4

LifeProof installation video, https://www.youtube.com/watch?v=SsuXGPehys8........................4

## TABLE OF EXHIBITS[1]

| Exhibit Number | Brief Description |
|---|---|
| 1 | Initial Expert Report of Dr. Steven MacLean Regarding Infringement of U.S. Patent Nos. 8,584,423; 8,365,499; 9,249,581; 7,398,625; and 8,756,899, dated September 17, 2018 |
| 2 | Rebuttal Expert Report of Dr. Steven MacLean Regarding Validity of U.S. Patent Nos. 8,584,423; 8,365,499; 9,249,581; 7,398,625; and 8,756,899, dated October 29, 2018 |
| 3 | Reply Expert Report of Dr. Steven MacLean Regarding Infringement of U.S. Patent Nos. 8,584,423; 8,365,499; 9,249,581; 7,398,625; and 8,756,899, dated November 19, 2018 |
| 4 | RESERVED |
| 5 | RESERVED |
| 6 | Installation Instructions for the Home Decorators Collection Flooring Product, produced by Defendants at HNE0000211-220 |
| 7 | Excerpts of the Deposition Transcript of Richard H. Taylor, from July 3, 2018 |
| 8 | Exhibit 2 to the Deposition of William Hudson, Product Reviews for the LifeProof Flooring Product |
| 9 | Exhibit 3 to the Deposition of William Hudson, Product Reviews for the Home Decorators Collection Flooring Product |
| 10 | Excerpts of the Deposition Transcript of Mr. William Hudson, from July 25, 2018 |
| 11 | Excerpts of the Deposition Transcript of Eric Anderson, from July 31, 2018 |
| 12 | Excerpts of the Deposition Transcript of Steven MacLean, from December 11, 2018 |
| 13 | Photograph Designation DSC_0743 from Exhibit 12 to Mr. Richard Kaczkowski's Rebuttal Report |
| 14 | Installation Observations Regarding Select Claims of the '499 Patent (Exhibit H to Dr. MacLean's Opening Infringement Report) |

---

[1] The Exhibits provided in this table correspond to the Exhibits in the Declaration of Pilar G. Kraman filed concurrently herewith.

| 15 | Excerpts of the Deposition Transcript of Brian E. Saylor, from June 26, 2018 |
|---|---|
| 16 | Excerpts of the Deposition Transcript of Richard Kaczkowski, from December 17, 2018 |
| 17 | Claim Construction Declaration of Steven B. MacLean in Support of Plaintiff's Responsive Summary Judgment Brief and Exhibits A-F attached thereto |
| 18 | U.S. Patent No. 4,807,412 to Frederiksen |
| 19 | Response to Office Action dated October 23, 2014, for U.S. Patent No. 9,249,581 |
| 20 | The Resilient Floor Covering Institute: About the RFCI, *available at* http://www.rfci.com:80/About.htm (Exhibit F to Dr. MacLean's Rebuttal Validity Report) |
| 21 | The Resilient Floor Covering Institute, Resilient Flooring Materials, *available at* http://www.rfci.com:80/materials.htm (Exhibit J to Dr. MacLean's Rebuttal Validity Report) |
| 22 | Product Benefit Page for Allure ISOCORE Resilient Vinyl Flooring, produced by Defendants at HNE0000433 |
| 23 | The Home Depot, Vinyl Flooring & Resilient Flooring, *available at* https://www.homedepot.com/b/Flooring-Vinyl-Flooring-Resilient Flooring/N-5yc1vZapwr (Exhibit K to Dr. MacLean's Rebuttal Validity Report) |
| 24 | Flooring & Area Rugs, Home Flooring Ideas - Floors at The Home Depot, *available at* https://www.homedepot.com/b/Flooring/N-5yc1vZaq7r (Exhibit G to Dr. MacLean's Rebuttal Validity Report) |
| 25 | Excerpts of the Deposition Transcript of Michael Joshua Kaminsky, Eddy Boucké, Robert Corey Carter, and Richard Taylor, dated July 12, 2018 |
| 26 | Excerpts of the Deposition Transcript of Nick Jackson, from July 18, 2018 |
| 27 | Excerpts of the Deposition Transcript of Rhys G. Jones, from April 19, 2018 |
| 28 | Excerpts of the Deposition Transcript of John Kelsch, from April 20, 2018 |
| 29 | North American Laminate Flooring Association, Laminate Flooring Specifications and Test Methods (2008) |
| 30 | ISO 10582, Resilient floor coverings—Heterogenous poly(vinyl chloride) floor coverings—Specification (2010) |
| 31 | Excerpts of the Deposition Transcript of Steven MacLean, from December 20, 2018 |

| 32 | Excerpts of the Deposition Transcript of Per Nygren, from June 12, 2018 |
|----|----|
| 33 | Excerpts of the Deposition Transcript of Darko Pervan, from June 29, 2018 |
| 34 | U.S. Patent No. 6,006,486 to Moriau et al. |
| 35 | U.S. Patent No. 7,337,588 to Moebus |
| 36 | Excerpts of the Rebuttal Expert Report of Richard T. Kaczkowski Regarding Infringement |
| 37 | Exhibit W to Dr. MacLean's Opening Infringement Report |
| 38 | Exhibit 8 to Mr. Kaczkowski's Rebuttal Infringement Report |
| 39 | Letter From Martin A. Bruehs to Matthew T. Nesbitt, dated May 14, 2015, produced by Defendants at HDUSA_0010649-10650 |
| 40 | Product Benefit Page for Allure ISOCORE Multi-Width Plank, produced by Defendants at HNE0761210 |
| 41 | Allure ISOCORE Product Blowup, "Introducing the future of LVT!" produced by Defendants at HNE0761209 |
| 42 | Exhibit 11 to the Deposition of Brian E. Saylor, DIY Genius Webpage, "Allure ISOCORE Vinyl Plank Flooring Now Available in the USA!" from June 3, 2016 |
| 43 | License Agreement Between Innovations4Flooring Holding N.V. and Tower IPCO Company Limited, produced by Defendants at HNE0761596-761637 |
| 44 | Excerpts of the Deposition Transcript of Harlan M. Stone, from June 8, 2018 |
| 45 | Excerpts of the Deposition Transcript of Eddy Boucké, from July 9, 2018, in *Innovations4Flooring NV v. Välinge Innovation AB*, Case IPR2017-02130 |
| 46 | Excerpts of the Deposition Transcript of Laetitia Kimblad, from July 6, 2018 |
| 47 | Välinge Licensing Technology Flooring Licensing Strategy, produced by Välinge at VAL0057239 |
| 48 | Exhibit 12 to the Deposition of Brian E. Saylor, Halstead/Vertex Partnership Meeting, 2010 Planning, produced by Defendants at HNE0761066-761090 |
| 49 | Locking Technology for Wood, Laminate & LVT/Resilient Floorings, produced by Defendants at HNE0760669-760683 |
| 50 | Excerpts of Trial Testimony of Mohan Rao, submitted in *Sprint Commc'n Co., LP* |

| | | |
|---|---|---|
| | | *v. Time Warner Cable, Inc.*, No. 2:11-cv-02686 (D. Kan. Feb. 21, 2017), D.I. 397 |
| 51 | | Excerpts of the Deposition Transcript of Justin McLean, from December 12, 2018 |
| 52 | | Excerpts of Expert Report of Justin McLean, dated September 17, 2018 |
| 53 | | Rebuttal Expert Report of Justin McLean, dated November 19, 2018 |
| 54 | | Scherer, F.M. & Harhoff, D., *Technology policy for a world of skew-distributed outcomes*, 29 Research Policy 559-566 (2000) |
| 55 | | ████████████████████ produced by Välinge at VAL0070206-70246 |
| 56 | | ████████████████ produced by Välinge at VAL0057243-57245 |
| 57 | | Declaration of Jonathan D. Putnam in Support of AU Optronics Corporation's Reply Brief in Support of Its Motion for Permanent Injunction, submitted in *LG Display Co., Ltd. v. AU Optronics Corp.*, No. 1:06-cv-00726-LPS (D. Del. Aug. 17, 2010), D.I. 1588 |
| 58 | | Armstrong Flooring, *Commercial Flooring Glossary*, *available at* https://www.armstrongflooring.com/commercial/en-us/resources/flooring-glossary.html |
| 59 | | HomeAdvisor, *Pros, Cons and Costs of Laminate Flooring*, *available at* https://www.homeadvisor.com/r/pros-cons-laminate-flooring/ |
| 60 | | BuildDirect, *What Are the Various Layers of Laminate Flooring and What Are They Made Of?*, *available at* https://web.archive.org/web/20081218013452/ |
| 61 | | RESERVED |
| 62 | | Exhibit J to Dr. MacLean's Opening Infringement Report |
| 63 | | Exhibit I to Dr. MacLean's Opening Infringement Report |
| 64 | | Response to Office Action dated March 2, 2012, for U.S. Patent No. 8,365,499 |
| 65 | | Response to Office Action dated July 31, 2012, for U.S. Patent No. 8,365,499 |
| 66 | | Välinge Innovation AB's Rule 26(a)(2)(C) Disclosure of Testimony by Per Nygren |
| 67 | | Välinge Innovation AB's Rule 26(a)(2)(C) Reply Disclosure of Testimony by Per Nygren. |

| 68 | Excerpts of the Rough Deposition Transcript of Per Nygren, dated January 22, 2019 |
| 69 | Excerpts of the Deposition Transcript of William J. Kauffman, Ph.D., from December 6, 2018 |

## I.      INTRODUCTION

Defendants' scattershot motions for summary judgment serve only to highlight that disputed issues of material fact remain for the jury to resolve. Where the disputed facts do not support them, Defendants seek to rewrite the claims and the Court's claim constructions. Defendants' *Daubert* attacks likewise fail—Mr. Per Nygren and Mr. Justin McLean apply reliable methodologies and Defendants' criticisms ultimately go to weight, not admissibility.[2]

## II.      FACTS AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.      Summary Judgment of Non-Infringement for the '499 Patent Is Improper

The '499 patent is an innovative patent relating to the installation of resilient floorboards (e.g., plastic floorboards). There is substantial evidence showing Defendants infringe the Asserted Claims of the '499 patent. Defendants dispute numerous facts, including the sequence of steps required by their instruction manuals, whether their installation videos depict or lead to bending, and whether using a tapping block is necessary. But *these are not legal issues*—they are disputed facts that the jury must resolve. Summary judgment is improper and should be denied.

The '499 patent describes a method for installing resilient floorboards with mechanical locking systems for vertical and horizontal locking. '499 patent at Abstract, 1:12-61. Designing an appropriate method and floorboard design for installing mechanically locking floorboards is complex. Mechanical locking systems for flooring have locking parts smaller than a few millimeters. *See, e.g.*, *id.* at 2:33-34; *see* Ex. 3 ¶ 51. Installing the flooring can create significant forces and stresses on the small locking parts, causing them to fail. *See, e.g.*, '499 patent at 1:31-

---

[2] Defendants' motion for summary judgment on abandoned claims is moot. *See* D.I. 318.

[3] Dr. MacLean submits a declaration in Ex. 17 as a supplement to his claim construction declarations (D.I. 88, D.I. 100) because Defendants have asked this Court to undertake additional claim construction at this stage of the case, *see* D.I. 306. Dr. MacLean's declaration is consistent with the opinions he offered in his expert reports.

48; Ex. 32 at 288:20-292:10. Locking forces are especially a problem for locking systems configured to secure floorboards *both* vertically and horizontally. *See* Ex. 32 at 171:24-172:3 ("[T]he stronger locking you want to make, the more overlapping surfaces, the more resistance you get during installation.").

Designing a locking system is more complicated for the so-called "fold-down" system, where one floorboard is directly folded down on an adjacent floorboard to install it. There is an inherent tension between creating a fold-down system that installs easily and has strong locking. *See, e.g.*, *id.* at 171:24-172:3, 258:12-17 ("We had the challenge of, that the locking could become too weak if we didn't design it properly."), 263:2-25 ("[T]he more strong you make it, the more complex it is to install."); *see also* '625 patent at 12:31-39 ("[a]t the short side where the strength requirements are considerably higher," noting the need to "reduce[] the risk of cracking" the floorboard "when subjecting the installed floor to tensile load"); *accord* Ex. 32 at 288:20-289:8 ("The fibers of the HGF [sic] makes it crack.").

To decrease forces during a fold-down locking process, one could create a locking system with no vertical locking, but such a locking system may come apart during use. Ex. 32 at 289:15-291:15, 163:7-164:2, 171:18-172:14. Other options include using a locking system that relies on intricate sliding, angling, or other installation steps, but such systems can slow installation. '499 patent at 1:31-48. Prior to the '499 invention, other companies tried to create robust fold-down systems but failed to do so. *See, e.g.*, Ex. 2 ¶¶ 35-37.

The '499 patent solved these issues by combining specialized floorboard technology with specific installation steps. The '499 patent starts with the foundation of a resilient floorboard that uses a mechanical locking system providing vertical and horizontal locking. The floorboards are, "in a preferred embodiment[,] made of a bendable thermo plastic, e.g. vinyl, surlyn, and PVC.

Floorboards of vinyl are generally referred to as LVT (Luxury Vinyl Tiles)." '499 patent at 2:29-37. Unlike laminate (wood-based) floor technologies, resilient floorboards can bend simultaneously in different directions without the lock breaking. *See* Ex. 3 ¶¶ 129, 153.

The inventors combined this innovative locking technology with a specialized installation method. Ex. 32 at 263:2-25; *e.g.*, *id.* at 271:13-20 ("[W]e arrived at, as I referred to the optimal combination of vertical locking strength, locking design, and ease of installation . . . ."), 285:6-25. An important step of the method involves bending the resilient floorboard. Figs. 1a and 1b, below, show an example of this bending, where one part of the short edge of floorboard 2 is locked flat relative to floorboard 3, and another part of the short edge of floorboard 2 is unlocked and angled upward (a bend creates the angle between the flat and raised portions).



'499 patent at Figs. 1a, 1b (annotated). This "makes it possible to finalize the connection of *only a part* of the edge of the floorboard, instead of the whole edge as in the known methods." *Id.* at 1:49-65 (emphasis added). This method, combined with using resilient floorboards with a vertical and horizontal mechanical locking system, permits strong locking *and* easy installation. *See, e.g.*, *id.* at 1:29-65; *see also* Ex. 32 at 263:2-25, 271:13-20, 285:6-25.

Defendants, without authorization, have been using the '499 invention. Dr. MacLean provided an extensive report detailing Defendants' infringement of the '499 patent. An example of Dr. MacLean's analysis is provided below, depicting bending of the Accused Products during installation. The flat installed region (blue) transitions to an uninstalled angled region (yellow).



Ex. 1 ¶¶ 185-448; Ex. 62; Ex. 63. As shown above, a bend, even if relatively small, *necessarily* exists between the flat and angled region. Ex. 3 ¶¶ 42-43. The size of the bend along the edge is immaterial to the '499 patent as long as the bend allows for part of the board to be installed and part of the board to be uninstalled. *Id.*; *see also id.* ¶ 44.

Defendants claim that no evidence of direct infringement exists, D.I. 306 at 5-11, even though they recorded their own direct infringement while making consumer website installation videos, *e.g.*, https://www.youtube.com/watch?v=eqvQiA7u254 (ISOCORE installation video); https://www.youtube.com/watch?v=SsuXGPehys8 (LifeProof installation video); *see also, e.g.*, Ex. 1 ¶¶ 187-225, 321-357, 898-909; D.I. 307-4 Ex. 27. Defendants posted their videos to YouTube and Home Depot's website to induce consumers and installers to perform the claimed method. *Id.* Defendants also shipped the Accused Products with written installation instructions directing consumers and installers to perform the infringing method depicted in the videos. Ex. 6; D.I. 307-1 Ex. 5; *see also, e.g.*, Ex. 1 ¶¶ 187-225, 321-357. Defendants' customers follow these installation videos and instructions and even post their experiences on Home Depot's website—a point admitted by Defendants, *e.g.*, Ex. 7 at 125:5-24, 135:9-136:4 ("happy customer telling

people about their experience installing" the products); Ex. 8 at 8 ("I can tell you that . . . installation was easy. Follow the instructions and watch some YouTube videos."); Ex. 9; Ex. 10 at 86:6-89:24, 112:19-115:7; Ex. 11 at 125:7-126:14—so there is significant evidence showing both direct and indirect infringement. *See, e.g.*, Ex. 1 ¶¶ 892, 897, 899-902. Defendants try to challenge Välinge's infringement proofs. However, in trying to show no disputed facts exist, Defendants succeed only in highlighting the factual disputes precluding summary judgment.

According to Defendants assert that "Välinge's sole evidence of infringement is Dr. McLean's [sic] installation methodology . . . ." D.I. 306 at 5-6. This is incorrect. Dr. MacLean relied on extensive evidence beyond his testing, such as "technical materials Defendants produced, including material ingredient reporting forms, locking profiles, and testing documents; marketing materials, including product packaging and product benefit pages; and installation instructions and videos." Ex. 1 ¶¶ 187, 321. Dr. MacLean also relied on "deposition testimony of Defendants' corporate and fact witnesses," which confirmed the infringement, as well as his own "personal examinations of LifeProof and ISOCORE." *Id*. Even if Dr. MacLean had conducted no testing at all, there is more than enough evidence for a reasonable jury to find infringement.

According to Defendants, "Dr. MacLean does not contend [the] instruction manuals or instruction videos 'teach all of the steps of the method claims.'" D.I. 306 at 7-8. This is inaccurate. Dr. MacLean opined and the videos themselves show all the claimed steps. The *only step* that Defendants even dispute is the bending step, and Dr. MacLean explained that this step is inherent in the installation instructions and method depicted in Defendants' installation videos. *See, e.g.*, Ex. 1 ¶ 207; *id.* ¶ 212 ("Th[e] piecewise engagement along the short edge of the floorboard necessarily results in the bending of the first floorboard edge up from the top surface

of the second floorboard so that only a first part of the first floorboard edge is in contact with the second. . . . This is shown below in a still shot from the Defendants' installation video.").



*Id.* ¶ 212; *see also id.* ¶¶ 307, 344, 435; Ex. 12 at 82:14-23 (discussing video, "Q: So even if the first portion of the short edge is fully locked, you can't tell definitively whether this installation demonstrates -- whether the bending limitation of the '499 Patent, claim 1 is met as construed by the Court in this case, correct? . . . A: I can absolutely tell that this is bending."), 84:24-85:18 ("It appears that there's still a bend up there where the second board is higher than the first board or the board to the right is slightly higher than the board to the left.").

Defendants next assert that when the instruction manual tells the installer to "lock" the boards, it means to leave the boards *unlocked*. D.I. 306 at 8-10. This assertion contradicts the meaning  of the word "lock." Ex. 3 ¶ 35. It also contradicts Defendants' instruction video, which shows the installer locking the floorboard after dropping it into position. Defendants ask the court to pretend the board is not locked, even though the end of the floorboard shows a locked element (circled in picture above). According to Defendants, the board must be unlocked because a seam is visible between the boards. D.I. 306 at 8. But a seam is often visible between boards due to dissimilar decorative patterns, beveled edges, or an overwood. Indeed, the seam is visible in boards Defendants contend are fully installed. *See, e.g.*, Ex. 13.

Raising another factual dispute, Defendants assert a distinction between installing the short side by hand or with a soft-faced hammer. D.I. 306 at 9-10. However, Defendants' installation instructions require that the short edge be "lock[ed]," and do not exclude using either a hammer or hand pressure. *See, e.g.*, Ex. 6; D.I. 307-1 Ex. 5. The installer in the video was strong enough (or the boards were worn enough) to lock the boards piecewise by hand. D.I. 307-4 Ex. 27; Ex. 12 at 80. Dr. MacLean used a hammer. *See* Ex. 14; Ex. 1 ¶¶ 207-225. Both led to the same result, i.e., the board locked via bending. Tellingly, Defendants nowhere contend that individuals can install their products with a single hammer blow or a single push of the hand. Their witnesses conceded that the opposite is true—further evidence a reasonable jury could rely on to find that the Accused Products are installed by using the claimed bending. Ex. 1 ¶¶ 211, 219-221; Ex. 7 at 152:3-16; Ex. 15 at 94:4-95:3; Ex. 11 at 181:5-17 ("Halstead recommends that you use multiple strikes from one end of the joint to the other on the short end.").

Defendants flag statements in their instructions about using a tapping block, asserting that the tapping block somehow disrupts the bending step, *see* D.I. 306 at 9-11, but this assertion is riddled with factual errors. First, it assumes that using a tapping block is a required step, which it is not. Ex. 3 ¶ 38; Ex. 6; D.I. 307-1 Ex. 5. The tapping block is only needed "to ensure a tight fit," assuming a tight fit is not already achieved during locking. *E.g.*, Ex. 3 ¶ 38. Dr. MacLean achieved a tight fit during his implementation of the installation instructions following the locking step, and he confirmed his tight fit with a visual and tactile inspection—a well-understood method in the art. *Id.*; *see also* Ex. 12 (Dr. MacLean) at 39:13-40:18, 45:22-46:14, 48:2-49:11; Ex. 16 (Mr. Kaczkowski) at 138:17-21, 139:2-140:13, 117:8-118:4. Second, Defendants place the tapping block step 2.3 out of sequence, before the locking step 2.2. The instructions nowhere teach to tap along the long seam *prior to* locking. Defendants further

7

misconstrue step 2.4 as the locking step; it is not. Rather, step 2.4 is for tapping and re-seating the short side if it becomes unseated while tapping the long edge during step 2.3. Ex. 6; D.I. 307-1 Ex. 5; Ex. 12 at 51:12-20, 65:21-66:16, 87:9-25. Last, Defendants' litigation-driven demonstration of using a tapping block is tainted. Their expert, Mr. Kaczkowski, performed his tapping-block method by hammering *on the back side* of a previously installed row boards, which is inconsistent with the installation video's demonstration and the instruction manual's plain language. *See* Kestle Decl. ¶¶ 2-3; *see also* Ex. 16 at 106:12-107:25. In short, Defendants' non-infringement positions at most raise disputed factual issues, and Defendants' motion for summary judgment should be denied.

### B.   Summary Judgment of Non-Infringement for the '899 Patent Is Improper

With the disputed facts from Defendants' motion on the '499 patent infecting its motion on the '899 patent, Defendants seek to rewrite the '899 claims such that the claimed floorboard edge can "[*only*] curve[] about an axis of curvature that is parallel to the second edge of the second floorboard." Nowhere does the patent or prosecution history demand this construction.[3]

The '899 patent is a continuation of the '499 patent and likewise relates to "a method of assembling resilient floorboards" involving positioning steps, a force-applying step, and bending step. '899 patent at Abstract, 1:33-35, 1:53-2:2, 2:31-35, 3:8-27. The method requires resilient floorboards having a mechanical locking system for vertical and horizontal locking of adjacent floorboards. The '899 patent discloses locking elements with specific geometries, surfaces, and features. *Id.* at 4:7-57. Claimed features in the '899 patent allow the downwardly protruding locking element 74 to clear the upwardly protruding locking element 73 and lock into position.

---

[3] Dr. MacLean submits a declaration in Ex. 17 as a supplement to his claim construction declarations (D.I. 88, D.I. 100) because Defendants have asked this Court to undertake additional claim construction at this stage of the case, *see* D.I. 306. Dr. MacLean's declaration is consistent with the opinions he offered in his expert reports.



*Id.* at Figs. 6a-6c. "The locking system decreases the friction forces that must be overcome when installing the resilient floorboards." *Id.* at 1:49-52.

Claim 1 of the '899 patent highlights a different type of bending than claim 1 of the '499 patent, *compare id.* at 6:7-11, *with* '499 patent at 6:7-11, although the '499 patent's type of bending can occur simultaneously, '899 patent at 7:22-32. The bending claimed in the '899 patent occurs at least within the locking mechanism at the short edge and is described as "bending the first floorboard at the first edge so that the first edge is curved about an axis of curvature that is parallel to the second edge of the second floorboard, the curved first edge being convex toward a bottom surface of the floorboards." *Id.* at 6:7-11; *see also id.* at 1:53-2:2. An example of the claimed bending is shown below:



*Id.* at Figs. 1a, 6a (annotated).

There is voluminous record evidence that Defendants directly and indirectly use the claimed resilient floorboard configuration, the vertical and horizontal locking features, and the claimed bending of the '899 patent. Defendants' own expert conceded that the Accused Products bend as described by Dr. MacLean. Ex. 3 ¶ 126 ("Mr. Kaczkowski concedes the photographs

9

presented in my opening report show bending at the short edge, e.g., of the upper strip, during installation, which he describes as a 'miniscule degree of bending.'"); *id.* ¶¶ 125-131; *e.g.*, Ex. 1 ¶¶ 715-723. Rather than dispute this, Defendants ask the Court to find as a factual matter that the Accused Products bend about an imaginary angled axis that Defendants superimposed on the products and drawings, and thus do not bend about the claimed parallel (non-angled) axis. D.I. 306 at 11-13. This argument ignores basic mathematics as this so-called "angled" bending is really the board bending about two axes simultaneously. As Dr. MacLean opined, the Accused Products simultaneously bend about an axis parallel to the second edge of the second floorboard ("long-side bending") and about a perpendicular axis ("short-side bending"), both of which are disclosed and claimed in the '899 patent. *See, e.g.*, Ex. 3 ¶¶ 125-131.

The mathematical principles that Defendants ignore are straightforward. An object can simultaneously move in three perpendicular directions, denoted as X, Y, and Z directions. Ex. 17 ¶ 8. Using the earth's surface as an example, the X direction could be east and west, the Y direction could be north and south, and the Z direction could be altitude. *Id.* An object can move in all three directions simultaneously. An airplane can—at the same time—fly southwest and increase in altitude. What is true of linear movement is true of rotational movement. An object can rotate (and bend) about multiple axes at the same time. *Id.* ¶ 9. For example, a bicycle wheel can rotate around the wheel hub (first axis), rotate by turning the bicycle's handlebars within the head tube (a second axis), and rotate around a third axis if the bike tips over. All three types of rotation can occur at the same time. A skilled artisan understands these basic concepts, and the '899 patent relies on them. *Id.* ¶ 10. Indeed, annotated Figure 1a (below) discloses bending about two different axes at the same time, with a blue arrow for bending the long side around an axis parallel to the short side ("short-side bending") and with a red arrow for bending the short side

10

around an axis perpendicular to the short side ("long-side bending"). *Id.* ¶ 11; '899 patent at Fig. 1a. Both types of bending are shown together.



The '899 patent claims bending about two perpendicular axes at the same time. Claim 1 recites "bending the first floorboard at the first edge so that the first edge is curved about an axis of curvature that is *parallel* to the second edge of the second floorboard." *Id.* at 5:66-6:17 (emphasis added). This is long-side bending. Claim 20, which incorporates the features of claim 1, recites "bending the first edge of the first floorboard *along **at least** the outermost surface of the first edge* above the top surface of the second floorboard." *Id.* at 7:22-32 (emphasis added). Bending the first edge along its outermost surface results in bending about an axis of curvature *perpendicular* to the edge of the second floorboard—i.e., short-side bending. The '899 patent thus claims bending the short side and the long side at the same time. Ex. 17 ¶¶ 10-11.

By admitting that the Accused Products bend around an imaginary angled axis, Defendants have conceded that the Accused Products bend along the short side and the long side at the same time, exactly what the '899 patent claims. *See* D.I. 306 at 11-13. Defendants' own illustration of their products bending (*see* figure below on left), compared to Figure 1a of the '899 patent (*see* figure below right) shows that the Accused Products do what the '899 patent claims. The figures are effectively identical.



*Id.* at 12; '899 patent at Fig. 1a (annotated).

Perhaps recognizing they effectively admitted infringement, Defendants assert Välinge limited the claimed bending during prosecution "*only* to those bends that result in an object that is curved about an axis of curvature that is parallel to the second edge, not objects that were curved about multiple axes" when distinguishing the Frederiksen prior art. D.I. 306 at 14 (emphasis added). But prosecution history disclaimer only exists when "allegedly disclaiming statements constitute 'a clear and unmistakable surrender of subject matter.'" *E.g.*, *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009), *amended on reh'g in part*, 366 F. App'x 154 (Fed. Cir. 2009) (citation omitted). This exacting standard is not met here.

*At no point* during prosecution did Välinge state, expressly or otherwise, the claims of the '899 patent were limited to "*only*" bending about an axis of curvature parallel to the second edge. D.I. 307-2 Ex. 9 at VAL0007607-7608. Rather, the proposed claims recited *at least* a bending about an axis of curvature parallel the second edge (the claims are "comprising" claims), *id.*, and Välinge distinguished Frederiksen Figure 6 as it "does not involve bending the mat IV at the first edge so that the first edge has an axis of curvature that is parallel to the second edge of mat III . . . ," *id.* This is not a "clear and unmistakable surrender" of bending about any other axis. Välinge simply acknowledged that Figure 6 lacked the bending claimed in the '899 claims. Ex. 17 ¶ 13.

A review of Frederiksen's Figure 6 shows that the distinction Välinge raised during prosecution is correct. Figure 6 of Frederiksen disclosed an interconnected mat flooring (e.g., for

a workshop) that uses a unique locking mechanism and joining process. The mat consists of square "flag members." *E.g.*, Ex. 18 at 4:63-65. Each side of the flag member has two coupling members that are joined and separated by vertical movement. *Id.* at 1:54-58, 3:53-4:2, 4:48-54. Each coupling member includes a protrusion and vertical slot. Unlike the claimed invention of the '899 patent, each coupling member does not by itself provide a vertical lock. The protrusion and vertical slot slide up and down relative to each other. *See id.*

To position a protrusion into its recess, Frederiksen raises one corner of the mat upward—in the direction of arrow "c"—and refers to this as "twisting." *Id.* at 5:17-20. It also states that the flag member may be "bent or drawn away from the third flag member III" in the direction "b" so head portion 18 can be introduced into recess 21. *Id.* at 5:12-20. However, as illustrated with the red annotations in Figure 6, the edges of the flag member remain *completely straight* during this process. To the extent that the flag member of Figure 6 bends, it does not bend at the edges. *Id.* at Fig. 6. By contrast, the '899 claims recite (and Figure 1a shows) "*the first edge is curved* about an axis of curvature that is parallel to the second edge of the second floorboard." '899 patent at 6:7-11 (emphasis added). The



"twisting" and "bending" motion in Frederiksen is not the claimed bending in the '899 patent (in addition to the other missing features, such as vertical locking). *See also* D.I. 307-2 Ex. 9 at VAL0007607-7608. Defendants' prosecution history disclaimer argument fails. Ex. 17 ¶¶ 14-16.

Defendants also make a potpourri of other incorrect factual assertions. They contend Dr. MacLean used a "new installation protocol" and a clamp was not permitted. D.I. 306 at 10-11. Using a clamp—which presses down on the board in similar fashion to a hand or a soft-faced

hammer—allowed Dr. MacLean to slow the installation process so he could scientifically observe and document it. *See* Ex. 1 ¶¶ 715-723. Moreover, apart from the testing, Dr. MacLean cited ample record evidence showing the Accused Products infringe the '899 patent from Defendants' technical drawings, data sheets, internal product testing, installation videos, installation instructions, marketing materials, and admissions. *See, e.g.*, *id.* ¶¶ 698-727, 795-823. Dr. MacLean strongly disputed Mr. Kaczkowski's opinion because it ignores the disclosure, claims, and mathematics. Ex. 3 ¶¶ 125-131. In sum, material factual disputes remain and summary judgment should be denied.

### C.      Välinge's Contributory and Inducement Claims Are Well Founded

Defendants contend Välinge "failed to demonstrate" direct infringement of the '499 and '899 patents, and thus cannot demonstrate induced infringement. D.I. 306 at 14-15. Defendants also argue their installation instructions do not encourage infringement because "the instruction manuals and videos mention nothing about bending." *Id.* at 14-16. Neither is true. Välinge has provided significant evidence of direct and induced infringement. The record evidence shows installation of the Accused Products according to their instructions *necessarily infringes* the '499 and '899 patents—as bending occurs both along and at the short edge—and DIY customers and installers install the Accused Products according to the instructions. *See supra* § II.A; Ex. 11 at 125:7-126:14 (installed according to instructions, "[o]therwise, [the instruction] doesn't have any value"); Ex. 8; Ex. 9; Ex. 10 at 86:6-89:24, 112:19-115:7; Ex. 1 ¶ 902; *id.* ¶¶ 899-903, 905-909. This is sufficient to show induced infringement.

Defendants also contend Välinge presented no evidence of contributory infringement, as they argue that "Dr. MacLean has also not set forth any opinion that the accused floorboards are 'not a staple article or commodity of commerce suitable for substantial noninfringing use.'" D.I. 306 at 15-16. Defendants have not and cannot show their Accused Products have any

14

noninfringing uses. Dr. MacLean opined "the Accused Products cannot be used with anything other than the Accused Products, as anything other than installed flooring, installed according to the methods in the Asserted Patents"—the "locking system designs along the long edge and short edges foreclose any reasonable alternative use. And, in my opinion, installing the Accused Products according to any method other than that set forth in the Asserted Patent[s] would be unusual and impractical." Ex. 1 ¶ 903 (citation omitted). "[The claimed] progression makes sense from a technical standpoint as it avoids mis-installation and damage to the locking system. It is also the natural progression given the orientation of the board." *Id*. ¶ 216. A reasonable jury could find contributory infringement with Defendants' technical materials, locking systems, and installation instructions, as well as Dr. MacLean's infringement opinion. *See, e.g.*, *id*. ¶¶ 185-448, 696-887. This is sufficient to show contributory infringement.

### D.    Summary Judgment of Non-Infringement for the '581 Patent Is Improper

The '581 claim feature "angles inward towards" requires no more than a lower wall that angles inward in the direction of the chamfered guiding surface below it. According to Defendants, the angled lower wall must straight-line intersect the chamfered guiding surface. The '581 claims are not so limited. Defendants' construction, and their motion for summary judgment which hinges upon it, should be rejected.

The '581 patent is a continuation of the '899 patent and describes resilient floorboards with a mechanical locking system along the short edge. '581 patent at 1:17-19. The Asserted Claims recite "resilient floorboards" with a mechanical locking system that has a "downwardly protruding locking element" that has "an outermost side facing the adjacent floorboard" and "a chamfered guiding surface." *Id.* at 6:2-24. The locking element has "an angled lower wall that angles inward toward the chamfered guiding surface directly from the first vertical wall." *Id.* at 6:20-23. The claims explain the relative location of the "angled lower wall" and chamfered

guiding surface, stating "the chamfered guiding surface is below the angled lower wall." *See id.* at 6:22-23. As the plain language of the claims makes clear, the angled lower wall angles inward in the direction of the chamfered guiding surface, which is below the angled lower wall. *Id.* at 6:20-23; Ex. 1 ¶¶ 485-486; Ex. 3 ¶¶ 66-67. Nothing else is required. *See, e.g.*, Ex. 17 ¶¶ 17-18. One example of the angled lower surface can be seen in annotated Figure 6c below, where the "angled lower wall" angles into the floor panel toward the chamfered guiding surface lying below it. The Accused Products satisfy this understanding. *See, e.g.*, Ex. 1. ¶¶ 485-486; Ex. 3 ¶¶ 66-67.



Defendants invent a new requirement for "angles inward toward"—requiring that the lower wall in a straight line intersect the "chamfered guiding surface." D.I. 306 at 28. To reach this construction—which is never discussed in the specification—Defendants allege the claims contain two elements: "requiring the angled lower wall ***both*** to angle [1] 'inward' ***and*** that the inward angle be [2] 'toward the chamfered guiding surface.'" *Id.* at 27. Defendants are incorrect.

"Angles inward toward" should be interpreted as a whole. Ex. 17 ¶ 19. "[T]oward the chamfered guiding surface" merely identifies the direction of the inward angle, that is, in the direction of the chamfered guiding surface below it. *Id.* Put differently, the word "inward" is relative, and "angles inward toward" provides a frame of reference—i.e., inward toward the guiding surface rather than "angled outward away" from it. Even assuming "angles inward toward" is bifurcated into two terms, the plain language provides the lower wall is angled (i) into

the board and (ii) in the direction of the chamfered guiding surface lying below it. *Id.*; *see* Ex. 12 at 206:23-207:18; Ex. 1 ¶¶ 485-486; Ex. 3 ¶¶ 66-67. As shown in Figure 6c, the angled lower wall angles (i) into the board (ii) down in the direction of the chamfered guiding surface below it (below left). '581 patent at Fig. 6c. This is distinct from a situation where the angled lower wall angles (i) inward but (ii) up away from the chamfered guiding surface (below right).



Nothing in the specification or prosecution history supports Defendants' contention that the angled lower wall should be specifically angled to straight-line intersect the chamfered guiding surface. Indeed, the prosecution history merely provides the downwardly protruding locking element includes "at least a first vertical wall above an angled lower wall, and the chamfered guiding surface is below the angled lower wall." Ex. 19 at VAL0010511. Defendants' unsupported intersection construction should be rejected and summary judgment denied.

### E.    Summary Judgment of Non-Infringement for the '625 Patent Is Improper

The Accused Products infringe claim 1. Defendants' attempt to circumvent infringement by asserting that *portions* of their Accused Products do not infringe is wrong as a matter of law. A purported lack of infringement at one location does not negate infringement at another. The Federal Circuit "ha[s] never required that a claim read on the entirety of an accused device in order to infringe." *SunTiger, Inc. v. Sci. Research Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999); *see also Intel Corp. v. Future Link Sys., LLC*, 268 F. Supp. 3d 605, 617 (D. Del. 2017). Defendants' unfounded argument conflicts with the law and claim 1.

The '625 patent represented an important advance in designing a mechanical locking system that was strong, simple to manufacture, and easy to install. Prior art systems had locks with at least four contact surfaces to prevent the floorboards from separating: two contact surfaces to prevent the boards from moving apart laterally, and two contact surfaces to prevent the boards from moving apart vertically. These prior art systems emphasized that contact on the top and the bottom of the tongue was critical to carry loads through the board and maintain a tight fit. *See, e.g.*, Ex. 1 ¶¶ 604-605; Ex. 2 ¶¶ 72, 76; Ex. 33 at 204:1-206:22, 210:8-213:11; Ex. 34 at 2:64-3:3 7:5-9, 12:28-39 ("contact surfaces 85-86, more particularly abutment surfaces, formed by the upper side of the tongue 9 and the upper side of the groove 10 . . . , as well as *contact surfaces cooperating with each other*, formed by curvatures 77-78 [lower side of the tongue and tongue groove], with the advantage that *no mutual displacement in height between two engaged floor panels 1 is possible* . . . ." (emphases added)), Fig. 23.

Turning traditional designs on their heads, the '625 patent's inventor, Mr. Darko Pervan, invented a locking system that introduced space where prior art systems would have required contact. These spaces in the locking system allowed for looser tolerances and free play, and thus quicker manufacturing and easier installation. The '625 patent explains:

> A free play between surfaces which are not operative in the locking system facilitates manufacture since such surfaces need not be formed with narrow tolerances. . . . If the inoperative surfaces in the locking system are spaced from each other, the friction in connection with lateral displacement of joined floorboards along the joint edge will decrease.

'625 patent at 11:51-64. The locking surfaces provided these benefits and strong locking.

The claimed contact surfaces and inoperative spaces are depicted in annotated Figure 6 (*see* below). There are first contact surfaces at the upper edge of the panels, second contact surfaces between the upper tongue surface and upper tongue groove surface, and a locking surface on an upwardly projecting locking element. *Id.* at 13:34-14:9. There are also two

18

inoperative spaces: one between the upper edge of the floor panel and the upper surface of the tongue, and a second between the upper surface of the tongue and the upwardly projecting locking element. The second inoperative space can lie below the lower tongue surface, as in the "not in direct contact" limitation of claim 1. The inoperative spaces allow for economical manufacturing and reduced friction. *Id.* at 10:33-42, 11:51-64; *see also, e.g.*, Ex. 2 ¶¶ 26-33; Ex. 1 ¶¶ 605-612.



Defendants contend the Accused Products lack the "not in direct contact" limitation because—*in some cross sections*—the lower tongue surface contacts the lower tongue groove surface. D.I. 306 at 16-21. Their analysis misconstrues the claim and misunderstands the law.

Defendants ignore that claim 1 recites a "locking system" that need only exist along a "portion" of a floorboard. '625 patent at 13:34-38 ("A *locking system* . . . for horizontal joining of a first and a second joint edge *portion* of a first and a second floorboard . . . ." (emphases added)). As a "comprising" claim, claim 1 allows for other locking features at other portions of the Accused Products. *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed. Cir. 1990) (cannot avoid infringement where "claimed feature performs not only as shown in the patent, but also performs an additional function"); *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 731 F.2d 840, 848 (Fed. Cir. 1984) ("device cannot escape infringement by merely adding features, if it otherwise has adopted the basic features of the patent." (citation omitted)); D.I. 17 ¶ 20.

The disclosure supports this understanding. Figure 6 "shows a variant of a *locking system . . . for which protection is sought* and which has not yet been published." '625 patent at 8:36-38 (emphasis added). The features in Figure 6 are shown in cross section—i.e., a "portion" of the length of the floorboard. Other features may exist at other portions of the floorboard. Ex. 17 ¶ 22.

> Several variants of the invention are feasible. The joint system can be manufactured with a large number of different joint geometries, some or all of the above parameters being made different . . . .

> The height of the locking element and the angle of the locking surfaces can be varied. Nor is it necessary for the locking surface of the locking groove and the locking surface of the locking element to have the same inclination or configuration. Guiding parts can be made with different angles and radii. The height of the locking element can vary over its width in the principal plane of the floorboard, and the locking element can have different widths at different levels.

'625 at 13:7-21. Indeed, having locking features that vary along the length of the floorboard was known. *E.g.*, Ex. 35. A locking system exists if it performs the locking function (it locks) and need not exist at every location along the board to perform this locking function. Ex. 17 ¶ 21.

Accommodating variation along the length of the tongue and tongue groove, including surfaces "not in direct contact" and surfaces in contact, comports with the disclosure. The '625 patent recognized "floorboards [are] often warped and curved," '625 patent at 7:29-34, and the locking system may vary along the length of the board, *id.* at 12:15-18. Accommodating variation is a primary focus of the '625 invention (*supra*), so it is no surprise variations occur, and such variations certainly do not defeat infringement.

In the context of the "locking system" and "portion" claim language, the "not in direct contact" feature is satisfied if present *at any point along the floorboard*. The plain meaning of two surfaces "not in direct contact" follows from the "second inoperative space" limitation. Claim 1 requires "a second inoperative space in the locking system *between* [1] the second coacting contact surfaces and [2] the locking surfaces when the first and the second floorboards

are joined horizontally and vertically." *Id.* at 13:66-14:6 (emphasis added). The word "between" here refers to a point between the contact surfaces and locking surfaces following along the seam between boards in a cross section of the floorboard. One location among others for a space "between" these surfaces is at the lower tongue surface. This is where claim 1 introduces the "not in direct contact" feature. Claim 1 positions a space where "the lower tongue groove surface and the lower tongue surface are not in direct contact with each other when the first and the second floorboards are joined horizontally and vertically." *Id.* at 13:66-14:6; Ex. 17 ¶ 23. Put another way, two non-contacting surfaces create a space, and the "not in direct contact" limitation locates that space in a cross-sectional area between the lower tongue surface and lower tongue groove surface. However, nowhere does claim 1 preclude contact along the *entire* edge beyond the cross section. Indeed, the term "not in *direct* contact" only prohibits "direct" contact at the given "surface" (e.g., at a cross section); it does not prohibit contact at *another* location further up or down along the joint edge. Ex. 17 ¶ 24.

At its core, Defendants' "not in direct contact" argument recycles the claim construction arguments Defendants made when addressing "inoperative space" during the *Markman* hearing:

> If you think about this in the real world, we are going to have planks that are three dimensional, that extend this way, out of the page, and extend into the page. So does the inoperative space have to extend the entire length of the floorboard to be infringing or if, for instance, because of manufacturing tolerances there ends up being some intermittent unintended spaces throughout that blank, is that an inoperative space?

D.I. 129 at 83:24-84:9. The Court considered this issue and adopted Välinge's construction:

> THE COURT: What about the question of, if the space need to be continuous all along where I guess the two planks come together, what if it is only part of that dimension?

> MR. COOLEY: Again, that would -- if you had a partial space, that would achieve the goal of the patent where it is talking about reducing friction. You would reduce friction in that locality.

THE COURT: So it could be an inoperative space.

MR. [COOLEY]: It could be an inoperative space.

*Id.* at 89:15-24. Like the inoperative space limitation, the two surfaces "not in direct contact" can be met by a portion of the length of the floorboard, and nothing in the claim requires otherwise.

With the claim language understood properly, a reasonable jury could find infringement. Dr. MacLean's opinion is that *upwards of 64% of the length of LifeProof products infringe claim 1*. Ex. 1 ¶¶ 605-695; Ex. 3 ¶¶ 71-119. And Defendants' expert agreed the features of claim 1 are met along a significant portion of the floorboard. *See, e.g.*, Ex. 36 ¶¶ 81-82.

Defendants suggest the lower tongue surface is continuous and in direct contact because Dr. MacLean identified a continuous tongue. D.I. 306 at 20. Whether the lower tongue surface is continuous is a disputed material fact. Even if the *tongue* is "continuous" in some sense, it does not mean that a lower *surface* of the tongue is continuous or in direct contact. The undisputed evidence is that the Accused Products have a lower tongue surface that is not in direct contact at many cross sections and is not continuous. The discontinuous nature of the lower tongue surface is visible in the cross sections in both parties' expert reports. *See, e.g.*, Ex. 37; Ex. 38.

Defendants' assertion that spaces created in the locking system of the Accused Products were accidental, D.I. 306 at 20-21, is similarly inapposite. █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████ *Ethicon Endo-Surgery, Inc. v.*

22

*Covidien, Inc.*, 796 F.3d 1312, 1326-27 (Fed. Cir. 2015). Moreover, Defendants denied Välinge access to their factories, D.I. 216, and should not be allowed to backdoor untested manufacturing evidence to contest infringement.

### F.  Summary Judgment of Non-Infringement for the '423 Patent Is Improper

A reasonable jury could find the Accused Products infringe the '423 patent based on the evidence of record. There is nothing to support Defendants' new-found claim construction that the claimed "material seal" *must* span the entire height of the floorboard, from "top to bottom."

Flooring composed of more than one material or layer was known. Moisture penetrating and damaging installed floors was a problem for early multi-layer systems. '423 patent at 4:15-41. Moisture penetration is especially problematic in surface layers of a floorboard, where it can lead to swelling and warping of the joint edges and to cracking of surface layers. *Id.* at 4:20-27. Some locking systems combatted moisture penetration by coating joint surfaces with moisture-sealing material, such as wax or silicone, by inserting elastic sealing means between adjacent floor panels, or by spraying chemicals at the joint edge to impregnate the floor panel. *Id.* at 5:17-55. These systems, however, were difficult to install and manufacture. *See, e.g.*, *id.* at 5:38-44, 5:65-6:25. Early multi-layer flooring systems also had inferior locking systems and inferior layer buildups, with individual layers that exhibited poor performance. *Id.* at 8:16-22.

The '423 patent conceived of new and improved flooring that addressed these issues. Ex. 33 at 111:17-112:3. It describes the combination of a horizontal mechanical locking system with an innovative multi-layer construction that includes a core, an upper surface layer of the core, a resilient surface layer that forms a material seal, and a surface layer. '423 patent at 38:14-26; *see also id.* at 9:51-63, 1:30-32, 8:54-61. The multi-layer construction can also include a decorative layer. *See id.* at 3:49-54, 22:13-58.

Defendants dispute infringement of only one aspect of the '423 invention: the "material seal." 305-1 Ex. F ¶¶ 38-61. The '423 patent explains a "material seal" "prevents or counteracts spreading of moisture from the joint edge of a floor panel into the floor panel." '423 patent at 8:4-6. The material seal has several embodiments. In one embodiment, the seal is *applied to* an edge of one or more layers to prevent moisture from spreading from the joint edge of the floor panel into the floor panel. *See, e.g.*, *id.* at 9:56-10:2, 10:57-11:16; Ex. 17 ¶ 28.



In another embodiment, one or more layers are *composed of* a sealed material, such as, plastic. *See, e.g.*, '423 patent at 10:65-11:3 ("[T]he laminate's *reinforcement layer* of phenol-impregnated kraft paper under the decorative layer can constitute a *material seal*. Another alternative is that *a moisture-proof plastic layer* is applied between the core and the decorative surface layer in the entire panel." (emphases added)). Making the layer of a sealed material likewise "prevents or counteracts spreading of moisture from the joint edge of a floor panel into the floor panel." *Id.* at 8:4-6; Ex. 17 ¶ 29.



The Asserted Claims, including claim 13, recite a robust four-layer (minimum) buildup:

> 13. A floor panel, comprising a body having [1] a core, wherein in said floor panel at least two opposite parallel joint edge portions are provided with connectors for mechanical joining of the floor panel in the horizontal direction with similar floor panels, said connectors having active locking surfaces for cooperation with corresponding active locking surfaces of adjacent floor panels after the floor panel has been joined therewith, the core having [2] an upper surface layer, wherein [3] a material seal of a resilient surface layer covers the upper surface layer of the core, the material seal is of plastic or linoleum, and [4] a surface layer is provided over the plastic or the linoleum and directly contacts the plastic or the linoleum, the surface layer comprising elastic material.

'423 patent at 38:14-26.

The '423 patent explains that the material(s) of some or all of the layers may be sealed with a material seal, and different embodiments have different layers or combinations of layers with material seals. *Id.* at 11:1-16, 38:14-26, 38:53-65. The Asserted Claims require *at least* the "resilient surface layer" has a material seal, but the claims are "comprising" claims and other layers may *also* have material seals. *Id.* at 38:14-26, 38:53-65.

A reasonable jury could find infringement based on Defendants' expert, who concedes Dr. MacLean is correct and the Accused Products include [1] a core, [2] an upper surface layer of the core, [3] a resilient surface layer, and [4] an elastic surface layer. Ex. 69 at 141:8-152:16. Defendant's expert also agrees with Dr. MacLean that the resilient surface layer in the Accused Products is made of a plastic that seals the layer against moisture. *Id.* at 146:3-17. Nor is there a dispute that the Accused Products include the claimed horizontal locking system or any of the other features of the Asserted Claims. *Id.* at 141:8-152:16. If the resilient surface layer in the Accused Products (the wear layer) did not have a material seal and the layer was water permeable, moisture could infiltrate the layer, cause warping and expansion, and destroy the floorboard—even if the layers above and below were waterproof. *See, e.g.*, Ex. 12 at 105:21-106:13; Ex. 33 at 113:3-116:22.

Defendants belatedly ask the Court to give them a second bite at the claim construction apple. They ask that the Court construe "material seal" to require that the seal extend along the floorboard edge "top to bottom." D.I. 306 at 22-26. But "material seal" has been stipulated as a "seal which prevents or counteracts spreading of moisture from the joint edge of a panel into the floor panel," D.I. 77 at 4, and this construction nowhere requires Defendants' "top to bottom" seal. Adding this feature would be inconsistent with the specification and claims.

First, the term "material seal" itself is inconsistent with Defendants' construction. The Asserted Claims recite a "resilient surface layer" with a material that is sealed—i.e., a material seal. The seal is a *material* seal, not an "entire floorboard seal" or "top to bottom edge seal," as Defendants would have the Court believe. Ex. 17 ¶ 26. The material of a resilient surface layer may be sealed by way of an applied material, such as wax, '423 patent at 20:60-65, or it may be sealed through the composition of the material in the layer itself—e.g., a plastic layer, *id*. at 11:1-3. The Asserted Claims specify the latter, stating that "the material seal is of plastic or linoleum." Because the material is sealed, it does not absorb moisture from the joint edge. Ex. 17 ¶ 26.

Second, Defendants' effort to construe "material seal" as a seal that must protect the *entire* joint edge "top to bottom" is contrary to the claims and specification. The claims nowhere recite "top to bottom," and the specification discloses various embodiments of a material seal where only a part of the joint edge is sealed. Ex. 17 ¶ 27. For example, in the embodiment of Figures 7a-7d, the "material seal 20" exists only at the upper portion of the floor panel.



Fig. 7d

The specification explains: "The *material seal* 20 can, because of the expense, *be limited to a part of the floor panel 1* where the intended connecting means are formed, and therefore, in an exemplary embodiment, does not cover the entire core surface 33." '423 patent at 16:59-62 (emphases added); Ex. 17 ¶ 30. The "material seal" of Figures 7a-7d could not exist with Defendants' "top to bottom" construction. Other embodiments also disclose that the "material seal" may exist along a portion of the joint edge. *See* '423 patent at Figs. 9a-9d, 10a-10c, 11a-11f, 12a-12b, 15a-15e, 16b-16e.

Third, Defendants conflate the definition of "joint edge" with that of "material seal," *see* Ex. 17 ¶ 31, arguing that the "joint edge" definition requires their "top to bottom" limitation, D.I. 306 at 21-26. It does not, and their entire argument misses the point. The phrase "*from* the joint edge *into* the floor panel" indicates the *direction* of sealing—laterally—not the height of the material seal. Ex. 17 ¶ 31 (emphases added).

Using Figure 7d below as an example, the '423 patent explains that "[a] considerable part of the upper joint edge portions 80, 81 is impregnated so as to form a material seal 20," '423 patent at 16:5-7, and there is no doubt the "material seal 20" prevents moisture from absorbing laterally into the floorboard. Ex. 17 ¶ 32. Material seal 20 would *not* prevent moisture from absorbing laterally into the floorboard *below* the material seal, but there is no seal at that location, so it is not be expected to. Requiring otherwise makes no sense. *Id.*



27

When the '423 patent seeks to protect multiple parts of the floorboard edge, it provides for multiple material seals at those portions or layers, *id.* ¶ 33, such as in Figure 9a:



The '423 patent discloses some embodiments with a "joint seal" to protect the floorboard joint. *See, e.g.*, '423 patent at 8:6-8, 10:27-35, 10:44-49, 18:1-9, 18:23-36, 19:3-6, Figs. 8c, 9b-d. The "joint seal" (example shown below) should not be confused with the "material seal" either. Ex. 17 ¶ 33. The joint seal seals the joint—it is a "seal which prevents or counteracts migration of moisture through the joint along the joint surfaces." *Id.* at 8:6-8. That is, it prevents *vertical* migration of moisture along the joint. The joint seal and the material seal *can* be combined into the same seal, *id.* at 11:13-14, but that is not required.



In sum, "material seal" is correctly construed as a "seal which prevents or counteracts spreading of moisture from the joint edge of a panel into the floor panel." D.I. 77 at 4. Nowhere does the claim or the specification require that a material seal span the entire height of the floor panel "top to bottom," and the claims do not require a material seal in any layer other than the

"resilient surface layer" (although the "comprising" nature of the claims permits material seals in the other layers). Summary judgment on the '423 patent should be denied.

### G.   Summary Judgment of Invalidity of the '499 Patent Should Be Denied

Defendants not only fail to prove Hannig '238 discloses every feature of claims 1, 30, and their dependent claims, they highlight various material factual disputes rendering summary judgment improper. Defendants' motion fails the exacting standard for anticipation, *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002); *Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995) ("requires identity of the claimed process and a process of the prior art"), and what any reference teaches is a question of fact for the jury, *see, e.g.*, *Xerox Corp. v. 3Com Corp.*, 458 F.3d 1310, 1320-23 (Fed. Cir. 2006); *see Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

### 1.   Hannig '238 Does Not Anticipate Independent Claims 1 and 30

#### a.   Hannig '238 does not disclose "resilient floorboards"

Hannig '238 does not disclose "resilient floorboards." *E.g.*, Ex. 2 ¶¶ 143-149. Resilient floorboards are an affirmative limitation of the claims and central to the invention. Defendants' anticipation argument relies on wood-based floorboards that are specifically distinguished in the '499 patent and that the flooring industry and Defendants' admissions distinguish from resilient flooring. Hannig '238 does not anticipate claims 1 and 30.

The claims recite a "method of assembling resilient floorboards, which are provided with a mechanical locking system for vertical and horizontal locking . . . ." '499 patent at 5:62-65. Defendants argue this preamble language is not a limitation. D.I. 306 at 29-31. This is incorrect. "[A] claim preamble has the import that the claim as a whole suggests for it." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (alteration in original) (citation omitted). If the preamble "[1] recites limitations of the claim, or, [2] if the claim preamble is

'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance of the claim." *Id.* (citations omitted). The recitation of "resilient floorboards" does both. Ex. 31 at 222:18-225:2.

First, a recitation in the preamble of "resilient floorboards, which are provided with a mechanical locking system," provides necessary *antecedent basis* for features in the body of the claim. Indeed, the body of the claim recites "*said* mechanical locking system," and this "locking system" is first introduced *as part of* the "resilient floorboards" in the preamble. '499 patent at 5:62-6:16 (emphasis added). The "resilient floorboards" also give antecedent basis to subsequent recitations of specific floorboards—"a first floorboard" and "a second floorboard." *See* '499 patent at 5:62-6:16. The inventors "clearly relied on both the preamble and the body of claim [1] to define the claimed invention." *Proveris Sci. Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1372-73 (Fed. Cir. 2014); *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1340-42 (Fed. Cir. 2003). For at least this reason, "resilient floorboard" operates as a limitation. Ex. 17 ¶ 37.

Second, the recitation of "resilient floorboard" in the preamble is "necessary to give life, meaning, and vitality" to the claims. *Pitney Bowes*, 182 F.3d at 1305 (citations omitted). As the specification establishes, resilient floorboards are a *fundamental characteristic* of the invention. The title of the invention—"Resilient Floor"—emphasizes the import of this claim feature. '499 patent at Title. The specification then highlights several known problems surrounding *resilient floorboards* and existing installation methods. *Id.* at 1:29-48. The '499 invention aims to resolve these problems by combining not just any type of flooring, but "resilient floorboards" with a unique locking system and installation method. *Id.* at Abstract ("method of assembling *resilient floorboards* is disclosed" (emphasis added)), 1:29-31 ("A method is disclosed for assembling of floorboards, which are so called *resilient floorboards i.e. the core is of a resilient material . . . .*"

(emphasis added)), 1:46-48 ("The locking system decreases the *friction forces that must be overcome when installing the resilient floorboards.*" (emphasis added)), 1:49-51 ("invention is a method of assembling *resilient floorboards*" (emphasis added)), 2:30-32, 3:6-8, 3:20-24 ("assembling a complete floor the method shown in FIG. 1a is naturally applied and repeated for each *resilient floorboard*" (emphasis added)). To read "resilient floorboard" out of the claim strips the invention of its meaning. *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309-10 (Fed. Cir. 2004); *see also Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) ("[The] specification makes clear that the inventors were working on the particular problem of displaying binary data on a raster scan display device and not general improvements to all display systems. In light of the specification, to *read the claim indiscriminately to cover all types of display systems would be divorced from reality.*" (emphasis added)). "[R]esilient floorboards" operates as a limitation of the claims for this reason as well. Ex. 17 ¶ 38.

Because "resilient floorboard" is a limitation fundamental to the invention, Hannig '238's failure to disclose resilient floorboards is fatal. Hannig '238 instead describes laminate flooring made of "wood or wood materials such as chipboard, MDF (medium density fibreboard), HDF (high density fibreboard) or other standard wood panel materials." D.I. 307-2 Ex. 11 at 10:18-26, 7:43-54; *see* D.I. 306 at 31. *None* of these is resilient flooring as would be understood by the skilled artisan.

The '499 patent is explicit that "resilient flooring" is not the same as (or anticipated) by laminate flooring. The '499 patent repeatedly distinguishes between "resilient floorboards" and wood-based flooring, such as laminate. For example, it distinguishes between a "[f]loorboard[] with a wood based core," which can be installed by an angling-angling, angling-snapping, or vertical folding method, and the "[f]loorboard[] of resilient material, e.g. PVC, . . . commonly

referred to as LVT (Luxury Vinyl Tiles)," which cannot easily be installed by angling-angling, angling-snapping, or vertical folding methods. '499 patent at 1:18-25. Resilient flooring can bend in multiple directions, as discussed above, and the '499 patent contrasts the locking system in "a wood based core" to the "mechanical angling locking system in a resilient floorboard with a shorter locking strip and/or higher locking angle and/or increased locking surface area . . . due to the resilient material, which makes it possible to bend the locking strip more without breaking it." *Id.* at 4:13-22; *see also* Ex. 59; Ex. 60; Ex. 17 ¶ 39.

In contrast to the laminate floorboards in Hannig '238,[4] which have wood-based cores, the '499 patent explains "resilient floorboards" are those where a "core is of a resilient material for example vinyl or PVC." '499 patent at 1:29-31. In one preferred embodiment, the "resilient floorboards are . . . made of a bendable thermo plastic, e.g. vinyl, surlyn, and PVC. Floorboards of vinyl are generally referred to as LVT (Luxury Vinyl Tiles)." *Id.* at 2:29-32; Ex. 2 ¶¶ 38-41.

Industry standards and publications confirm "resilient flooring" refers to "floorboards . . . made of a bendable thermo plastic, e.g. vinyl, surlyn, and PVC," not wood-based flooring, such as laminate. Ex. 2 ¶¶ 143-149; Ex. 31 at 225:15-226:20; Ex. 17 ¶¶ 41-45. The Resilient Floor Covering Institute, a North American manufacturers association, *e.g.*, Ex. 20, defines "resilient flooring materials" as follows:

> Resilient flooring refers to flooring materials which have a relatively firm surface, yet characteristically have "give" and "bounce back" to their original surface profile from the weight of objects that compress its surface. It has long been the most popular hard surface flooring in the United States.
>
> Resilient flooring materials are made in various shapes and sizes including both tile and roll form. Common types of resilient flooring include vinyl composition tile, vinyl tile and sheet, linoleum tile and sheet, and rubber tile and sheet.

Ex. 21 (Ex. J to Dr. MacLean's Rebuttal Report); *see* Ex. 30; Ex. 58. *Compare* Ex. 59; Ex. 60.

---

[4] This analysis applies to both Hannig '238 and WO '79845. The latter was late produced. Ex. 2 ¶¶ 191-192 & n.5.

Defendants' classification of its products as "Resilient Vinyl Flooring," as contrasted with laminate flooring, shows Dr. MacLean's opinion of the industry norm is accurate. For example, Defendants sell (and advertise) ISOCORE and LifeProof "Resilient Vinyl Flooring," which have the PVC (polyvinyl chloride) core. Ex. 22; D.I. 307-2 Ex. 10; Ex. 2 ¶¶ 146-147. They separately sell laminate flooring in an entirely separate flooring category, i.e., "laminate products." *See* Ex. 23; Ex. 24; Ex. 2 ¶ 148; Ex. 11 at 116:12-21; Ex. 25 at 109:1-19; Ex. 10 at 21:3-16, 28:16-20; Ex. 26 at 46:9-20 ("laminate" as "flooring with an MDF or an HDF makeup), Ex. 27 at 41:1-11; Ex. 28 at 10:17-11:18, 112:14-113:3, 153:22-25. Laminate flooring products include those made of HDF or MDF, not resilient flooring materials. Ex. 26 at 46:9-20; Ex. 59; Ex. 60; Ex. 29 at 8; Ex. 30; Ex. 17 ¶ 46.

Defendants' effort to broaden the well-known category of "resilient flooring" to include anything that may be "tending or able to recover from strain or deformation," D.I. 306 at 31-33, should be summarily rejected. Defendants' argument ignores the industry classification and their own admissions separately classifying "resilient flooring" and "laminate flooring" into categories based on material composition of the floorings. That an examiner might have confused a laminate with resilient flooring during prosecution does not void Defendants' admissions or the established industry norms (*e.g.*, Ex. 58; Ex. 59; Ex. 60). The difference between laminate and resilient flooring is significant to the '499 patent. Ex. 32 at 152:15-22 ("[W]hen a one-piece fold-down solution were used in laminate, you could not use . . . large overlapping surfaces, because the HF would simply break from, let's say, locking system design, because it would not have the resilient properties of a resilient material."), 266:25-267:9 Because it does not disclose the "resilient floorboards" limitation, Hannig '238 does not (and cannot) anticipate claims 1 and 30 of the '499 patent. At most, whether Hannig '238 discloses a "resilient floorboard" is a contested

fact that must be resolved as a question of fact by clear and convincing proof. Defendants' motion fails to meet this high bar.

### b. Hannig '238 does not disclose the "bending" limitation

The method recited in independent claims 1 and 30 requires "bending the first floorboard edge along at least the outermost surface of the first floorboard edge." '499 patent at 5:62-6:16, 8:20-40. As Dr. MacLean opined, a POSA understands that the claimed "first floorboard edge" is the *short edge* of the floorboard. Ex. 31 at 234:11-235:7. Because Hannig '238 fails to disclose bending along the short edge, Defendants' motion should be denied.

A POSA's reading of the "first floorboard edge" as the short edge of the floorboard is consistent with the prosecution distinguishing prior art for failing to disclose bending along the short edge. *See, e.g.*, Ex. 64; Ex. 65. Defendants' reliance on an isolated snippet from the specification ignores that the file history consistently refers to the claimed "first floorboard edge" as the short edge. *Id*. To the extent other embodiments may be contemplated in the specification, there is no requirement that the claims be read to cover every embodiment. *E.g.*, *PSN Ill., LLC v. Ivoclar Vivadent, Inc.*, 525 F.3d 1159, 1166 (Fed. Cir. 2008); *AllVoice Comput. PLC v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1248 (Fed. Cir. 2007). Accordingly, any alleged bending along the long edge of Figure 45 of Hannig '238 does not anticipate claims 1 and 30 of the '499 patent.

That the "first floorboard edge" is the short edge is significant because Hannig '238 fails to disclose bending along the short edge. As Dr. MacLean explained in his rebuttal expert report, a skilled artisan viewing Hannig '238—and its disclosure of HDF and MDF, its two-piece design locking system, the different locking designs along the long edge and short edge, and the express indication that the zip fastener principle is of "greater significance" to the long side—would not understand it to disclose bending along the short edge. *E.g.*, Ex. 2 ¶¶ 150-157. For this additional reason, summary judgment of invalidity should be denied.

34

2.      **Hannig '238 Does Not Anticipate the Additional Limitations in Dependent Claims 4, 9, 10, and 33 of the '499 Patent**

a.      **Dependent claims 4 and 33**

Defendants incorrectly contend that "Dr. MacLean does not dispute that Hannig '238 discloses the additional limitations provided by dependent claims 4 and 33." D.I. 306 at 35. Dr. MacLean opined Hannig '238 does *not* anticipate these claims. Ex. 2 ¶ 142. Moreover, whether Hannig '238 discloses features in dependent claims, including whether force is applied piecewise along the edge of the floorboard, *see* '499 patent at 6:25-31, is a fact question to be resolved by the jury. *See Xerox*, 458 F.3d at 1320-23; *Helifix*, 208 F.3d at 1346.

b.      **Dependent claim 9**

Dependent claim 9 requires a "first floorboard edge" of a first floorboard that bends along its outermost edge *and* an "adjacent edge" of a first floorboard that "connect[s]" to "another row by angling." '499 patent at 5:62-6:16, 6:42-45. Hannig '238 does not disclose the claimed "adjacent edge" either connecting [1] "to another row" or [2] "by angling."

The '499 claims discuss the assembly of first and second floorboards. *Id.* at 5:62-6:16, 8:20-40. Claim 1 describes a "*first floorboard edge* of a first floorboard," and claim 9 describes an "*adjacent edge* of the first floorboard." *Id.* at 5:62-6:16, 6:42-45 (emphases added). The adjacent edge connects "to [the] juxtaposed edge of a third floorboard in *another row* by *angling*." *Id.* at 6:42-45 (emphases added). Only the long edge can be connected to another row (*see* annotated Figure 1a below). The first edge is connected to floor panels *in the same row*. *Id.* As such, an "adjacent floorboard edge" must be the long edge and a "first floorboard edge" must be the short edge. Claim 9 therefore requires *angling* along the *long edge* and *bending* along the *short edge* of the first floorboard.



The '499 specification confirms this understanding. As the specification explains:

An edge of a floorboard 2 is positioned juxtaposed another edge of another floorboard 3. The edge of the floorboard is bent (30) along the edge during the assembling and the connection of the floorboard edges to each other. In this embodiment the edge and said another edge are short edges and a long edge of the floorboard is connected to a long edge of a floorboard 1 in another row, by a mechanical angling locking system . . . .

*Id.* at 3:6-16. This is further depicted in Figure 1a, above.

Defendants do not argue Figure 45 of Hannig '238 discloses angling installation along the long edge and bending installation along the short edge. D.I. 306 at 35-36. Nor do they argue Figure 47 of Hannig '238 discloses these two modes. *Id.* As illustrated below, *neither figure shows both* angling installation along the long edge and bending installation along the short edge.



D.I. 307-2 Ex. 11 at Figs. 45, 47 (annotations added).

Defendants accordingly present an anticipation challenge that cobbles together these two embodiments. This is improper *as a matter of law* because anticipation cannot be established by cobbling together disparate disclosure from different embodiments. *See, e.g.*, *Net MoneyIN, Inc.*

36

*VeriSign, Inc.*, 545 F.3d 1359, 1370-71 (Fed. Cir. 2008). But, more importantly, cobbling together the two embodiments still fails to present a proper anticipation challenge. At most, both figures depict installs along the long edge. Neither depicts anything other than the *straight short edge* during installation. *See* D.I. 307-2 Ex. 11 at Figs. 45, 47. And neither teaches the inventive *combination* of an angling installation and bending installation along two adjacent floorboard edges, as recited in claim 9. '499 patent at 5:62-6:16, 6:42-45. Hannig '238 does not anticipate claim 9.

### c.    Dependent claim 10

Defendants ignore disclosure in the claims and specification providing that the upwardly resiliently bendable locking strip requires a bend in the locking strip as in Figures 6a-c of the '499 patent. D.I. 306 at 36-37. Claim 10 requires: "wherein the upper locking strip is upwardly resiliently bendable in order to facilitate a positioning of the downwardly protruding locking element, between the upwardly protruding locking element and an upper edge of the second floorboard, into a position where the locking surfaces cooperate." '499 patent at 6:46-59. The specification explains that "[a]n upwardly bending of the upper locking strip 71 across the edge (*see* FIG. 6a-6b), facilitates a positioning of the downwardly protruding locking element 74 between the upwardly protruding locking element and an upper edge of the floorboard 3 in a position where the locking surface cooperates, as shown in FIG. 6c." *Id.* at 4:36-41.



*Id.* at Figs. 6a-6c. The type of bending disclosed by Hannig '238 that Defendants contend anticipates claim 10 does not "facilitate a positioning of the downwardly protruding locking

element." D.I. 306 at 36-37. They identify no disclosure that satisfies this claim limitation and thus cannot meet the exacting standard of anticipation.

Claim 10 also recites "which upper and lower locking strips are *integrally* formed in the floorboards, the upper and the lower locking strips are provided with a downwardly and an upwardly protruding locking element respectively, each locking element provided with a locking surface configured to cooperate for horizontal locking of the floorboards"; however, Hannig '238 discloses a two-piece system. As Dr. MacLean explained, "a *separate* locking element is *inserted* into (mounted onto) the floorboard edge." Ex. 2 ¶ 151; D.I. 307-2 Ex. 11 at 1:9-22, 1:30-34, 6:36-43, 6:55-67, 7:67-8:2, 10:36-49, 16:3-21, 17:39-45, Figs. 2-4, 12-42. This two-piece design can be seen in Figures 2-3 of Hannig '238, annotated above. Defendants' summary judgment motion fails for claim 10 as well.



### H. Subjective Willfulness Is for the Jury to Determine, and If Found, Only Then Does This Court Decide Whether Enhancement Is Warranted

Defendants invite this Court to take willfulness from the jury because they allegedly have "strong defenses." D.I. 306 at 37-40. But in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, the Supreme Court held "[t]he subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, *without regard to whether his infringement was objectively reckless.*" 136 S. Ct. 1923, 1933 (2016) (emphasis added). That is, willfulness does not turn on the Court's objective assessment of Defendants' defenses, but on Defendants' *subjective* intent— "a classical jury question." *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1250 (Fed. Cir. 1989), *abrogation on other grounds as recognized by Robert Bosch LLC v. Pylon Mfg. Corp.*,

659 F.3d 1142 (Fed. Cir. 2011). The Federal Circuit has affirmed that, post-*Halo*, "the *entire* willfulness determination is to be decided by the jury." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018) (emphasis added).

Here, material *factual* disputes remain as to whether Defendants "acted despite a risk of infringement that was 'either known or so obvious that it should have been known.'" *See, e.g.*, *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir. 2016) (quoting *Halo*, 136 S. Ct. at 1930). For example, the evidence at trial will show that as early as 2009, Halstead told Home Depot that "Unilin/Valange [sic] 'click technology' license is the *most valuable asset in the flooring industry*." Ex. 48 at HNE0761083 (emphasis added). Halstead also possessed a 2014 Välinge Locking Technology presentation highlighting Välinge's "integrated Fold Down system for LVT" for the short side and 2G "[a]ngle-angle" system for the long side—the very core technology embodying Välinge's locking patents in this case. Ex. 49 at HNE0760677. Even more, this same presentation identified each of the Välinge patent families at issue in this case.[5] *Id.* at HNE0760679.

In early 2016, Halstead prepared to launch its infringing ISOCORE flooring product. *See* Ex. 11 at 19:1-16, 20:9-21:22. Notably, Halstead developed an early iteration of ISOCORE that featured Välinge's patented 5G® two-piece locking technology. *Id.* at 23:22-28:7. Halstead even touted the benefits of Välinge's 5G® technology in several marketing materials and on its own website. Ex. 40 (ISOCORE 5G® locking advertisement); Ex. 41 (ISOCORE layers and featuring 5G® locking); Ex. 42 (June 3, 2016, website advertising 5G® locking).

---

[5] The presentation in Halstead's possession references Välinge's internal patent designations— "VA-9," "VA-12," and "VA-50"—rather than specific patent numbers. At the very least, the presentation is strong evidence that Halstead knew that Välinge's resilient LVT technology— including 2G and one-piece fold-down locking—is protected by patents. Moreover, Home Depot also had knowledge that Valinge owned patents covering its locking technology before this suit was filed. *See* Ex. 39 at HDUSA_0010650.

Notwithstanding its knowledge that Välinge's LVT/WPC technology is both valuable and patented, Halstead made a reckless choice. ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████.[6] Courts have recognized that indemnification can be relevant to show subjective willfulness. *See Coca-Cola Co. v. Pepsico, Inc.*, No. 1:02-CV-2887-RWS, 2005 WL 5974444, at \*1 (N.D. Ga. Mar. 17, 2005) ("Evidence of such indemnification provisions may be admissible to show the willfulness of Defendants' alleged infringement of the subject patents."); *see also Jurgens v. McKasy*, 927 F.2d 1552, 1562 (Fed. Cir. 1991); *Mass Engineered Design, Inc. v. Planar Sys., Inc.*, No. 3:16-cv-1510-SI, 2018 WL 3323762, at \*4-5, \*7 (D. Or. July 6, 2018); *C & C Jewelry Mfg., Inc. v. West*, No. C09-01303 JF (HRL), 2011 WL 2433817, at \*1 (N.D. Cal. June 13, 2011).

For its part, i4F's goal is to destroy Välinge with infringing technology.[7] i4F's Chief Technology Officer, Eddy Boucké, is a former Välinge employee with knowledge of Välinge's technology, patents, and licensing.[8] And Mr. Boucké's knowledge is Halstead's knowledge—Halstead designated Mr. Boucké as a corporate representative for technical issues in this case. ████████████████████████████████████, Defendants began selling the Accused Products no later than May 2016. And Defendants' subjective willfulness was cemented no later than March 28, 2017, when Välinge filed its Second Amended Complaint ("the SAC").[9] Over

---

[6] Ex. 43 § 13; Ex. 44 at 287:22-289:17. ████████████████████████████████████

████████████████████████████████████ ████

[7] Ex. 33 at 230:4-231:23 (Mr. Pervan, Välinge's founder, recalling meeting where i4F threatened to undermine Välinge's patents and destroy the company unless Välinge paid i4F €10 million).

[8] *See* Ex. 45 at 22:19-23:21, 33:16-34:17, 37:1-38:15.

[9] "[I]n respect of willfulness, there cannot be hard and fast *per se* rules." *Gustafson, Inc. v. Intersys. Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990) (citation omitted). While

twenty-one months have passed since Välinge filed its SAC, yet Defendants have done nothing to stop their infringing activity—they continue to knowingly sell more infringing products than ever, and they continue to knowingly instruct and encourage consumers to infringe by installing those products. *See* D.I. 246 at 1-10. At bottom, there is more than enough evidence—viewed in the light most favorable to non-movant Välinge—for a reasonable juror to conclude that Defendants knew or should have known that they were infringing the patents-in-suit.

Defendants ignore these facts showing subjective willfulness and instead recycle their motion to dismiss. D.I. 306 at 37-40. But this Court already held that post-suit conduct alone can be willful. D.I. 171 at 19-26; D.I. 295 (adopting Report and Recommendation (D.I. 171)); *see also Zimmer Surgical, Inc. v. Stryker Corp.*, No. 16-679-RGA-MPT, 2017 WL 3736750, at *2 (D. Del. Aug. 30, 2017). Defendants' mish-mash of soundbites notwithstanding, D.I. 306 at 38-39, a patentee is not required to seek a preliminary injunction to establish post-suit willfulness. "[T]he fact that a patentee does not file for a preliminary injunction should *not* be a barrier to that party's ability to bring *any* type of claim for willful infringement." D.I. 171 at 25-26 (emphases added); *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1295-96 (Fed. Cir. 2017).

Defendants' attempt to import "egregiousness" into the jury's willfulness determination is similarly unavailing. This Court's holding was unambiguous—"egregiousness must not be an element of a willful infringement claim." D.I. 171 at 18; *id.* at 10-19. Instead, courts consider egregiousness in deciding whether to enhance damages. Defendants' invitation for this Court to decide enhancement at summary judgment places the cart before the horse. As one court

---

Välinge asserts willful infringement at least by March 28, 2017, willfulness is informed by the "totality of the circumstances," including events predating the SAC. *See, e.g., Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 978-79 (Fed. Cir. 1986) (applying "totality of the circumstances" approach and refusing to overturn finding of willfulness where the allegedly improper copying "took place *before* the patent was issued").

explained, "the jury must decide whether the infringement was intentional, *and then* the court must decide whether the intentional conduct was egregious enough to justify enhanced damages." *Ericsson Inc. v. TCL Commc'n Tech. Holdings, Ltd.*, No. 2:15-cv-00011-RSP, 2018 WL 2149736, at *8 (E.D. Tex. May 10, 2018) (emphasis added). Indeed, "many of the *Read* factors are relevant to the question of whether an accused infringer willfully infringed the patent-in-suit *and* to the broader question of whether enhanced damages are appropriate." D.I. 171 at 17. While enhancement is ultimately left to the Court's discretion, "a judge cannot substitute his or her factual determination for a jury's willfulness finding." *Id.* at 17 n.10 (quoting *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.*, 265 F.3d 1294, 1310-11 (Fed. Cir. 2001)).

## III.   FACTS AND ARGUMENT IN OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY

### A.   Per Nygren's Anticipated Expert Testimony Is Reliable and Based on Välinge's Real-World Apportionment

Defendants do not challenge Mr. Nygren's qualifications to offer a damages opinion in this case. *See* D.I. 306 at 40-44. How could they? As an executive vice president at Välinge, Mr. Nygren negotiated scores of license agreements featuring the patents-in-suit. Ex. 66 at 2; Ex. 68 at 86:12-89:11. Instead, Defendants contend that Mr. Nygren's opinions are "nothing short of an attempt to circumvent controlling Federal Circuit authority requiring that a patentee isolate the value of the patents-in-suit when calculating a reasonable royalty." D.I. 306 at 41. Not so—Mr. Nygren's expected testimony is helpful to the jury precisely because it presents the real-world value of the patents-in-suit based on the market and Välinge's actual licensing practices. *See Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303-04 (Fed. Cir. 2015) (noting "comparable license valuations . . . —at least in some cases—may be the most effective method of estimating the asserted patent's value"). Mr. Nygren is expected to testify that Välinge's standard rates are apportioned to the value of the technology embodied in

the patents-in-suit[10]—technology that increases installation speed, strengthens locking connections, lowers manufacturing costs, and improves product buildup/waterproofness. Ex. 66 at 2-3; Ex. 67 at 2-3; Ex. 32 at 61:17-64:2, 108:18-109:22; Ex. 46 at 12:20-13:14, 14:23-16:13.

After years of analyzing the consumer benefits and cost savings that its patented technology provides over market alternatives—and *before* this litigation even began—Välinge established standard terms apportioned to the value of its angling 2G long-side technology in combination with its one-piece fold-down 5G-i short-side technology: ██████████████ ████████████████████████████████████████████████ Ex. 47; Ex. 56; Ex. 66 at 3-5; Ex. 67 at 2-3; Ex. 32 at 61:17-64:2, 69:17-23, 99:19-102:2; Ex. 46 at 12:20-13:14. To be sure, some of Välinge's licensees ████████████████████████████████████ ██████████████████████████, and Defendants are neither.[11] Ex. 32 at 77:14-87:16; Ex. 66 at 3-5; Ex. 67 at 4; Ex. 68 at 75:23-76:18, 248:5-250:17. What's more, Mr. Nygren is expected to testify that multiple licensees have taken 2G/5G-i licenses ████████ ████████████████████████████ Ex. 66 at 5; Ex. 67 at 4; Ex. 47; Ex. 56.

While it is true that Välinge's 2G/5G-i license agreements include additional patents beyond the five patents-in-suit, Välinge does not value its patents as pieces of paper, nor does it

---

[10] The hypothetical negotiation assumes that each of the patents-in-suit is valid and infringed, and Mr. Nygren was not required to provide an opinion on how the jury could assess damages if fewer than all five of the patents-in-suit are found valid and infringed. *See, e.g.*, *Finjan, Inc. v. Sophos, Inc.*, No. 14-cv-01197-WHO, 2016 WL 4560071, at *4 (N.D. Cal. Aug. 22, 2016). Mr. Nygren is nevertheless expected to testify that each patent-in-suit by itself would command a full royalty rate consistent with Välinge's standard term sheets for 2G/2G and 2G/5G-i based on that patent's technical value, but that Välinge does not stack its royalties. Ex. 47; Ex. 56; Ex. 67 at 3; Ex. 32 at 33:8-35:21, 39:13-42:3, 47:17-52:20; Ex. 68 at 37:15-40:4, 123:8-126:11, 130:11-133:20, 135:20-138:21.

[11] A "reasonable royalty" does not mean that ████████████████████████████ ████████████ If that were true, then Defendants "would have nothing to lose, and everything to gain if [they] could count on paying only the normal, routine royalty" that Välinge's best partners pay. Defendants would be in a "heads-I-win, tails-you-lose" position. *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1157-58 (6th Cir. 1978).

set royalty rates based on the number of included patents. Ex. 46 at 39:22-40:12. Rather, Välinge's license rates are apportioned to the value of its licensed *technology*. Ex. 32 at 108:18-109:22. And at the time of the hypothetical negotiation in May 2016, ███████████████ ████████████████████████████████████████████████ As Dr. MacLean explained, the patents-in-suit ████████████████████████████████ ███████████████████████████████████████████████ and they are used extensively by Välinge's 2G/5G-i licensees. Ex. 1 ¶¶ 920-966; Ex. 2 ¶¶ 506-777; *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) ("an invention used frequently is generally more valuable than a comparable invention used infrequently," and noting that "frequency of expected use and predicted value are related").

While Välinge's agreements include a comprehensive list of patents so that its licensees are given maximum comfort and assurance that they have all necessary rights, ██████████ ██████████████████████████████████████ Ex. 32 at 44:10-46:6, 48:9-49:16, 108:18-109:22; Ex. 46 at 25:10-15. That Välinge includes additional—███████████— patents in its 2G/5G-i license agreements for maximum comfort does not mean that Välinge would reduce its royalty rates if those additional patents were not included with the patents-in-suit. Ex. 66 at 2-3; Ex. 67 at 2-3; Ex. 32 at 108:18-109:22; Ex. 68 at 37:15-40:4, 123:8-126:11, 130:11-133:20, 135:20-138:21. Put differently, Välinge's royalty rates are apportioned to the value of its 2G/5G-i technology used by its licensees and embodied in the patents-in-suit, not on the total number of patents listed in a license agreement. Välinge has never reduced its 2G/5G-i license rates for a smaller set of patents. Ex. 32 at 52:9-20. Thus, Mr. Nygren's expected testimony satisfies *Uniloc*'s requirement that evidence "be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negations that would have taken

44

place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

Defendants' protests notwithstanding, Mr. Nygren's expected testimony that the five patents-in-suit would command Välinge's full 2G/5G-i rate—with some room to negotiate downwards[12]—is unremarkable and entirely consistent with real-world licensing.[13] Defendants' own damages expert, Dr. Rao, confirmed as much in another case that was recently affirmed by the Federal Circuit:

> You will often see that license agreements will tend to have sometimes dozens of patents or even have over a hundred patents, and that's because -- and including in my own experience, when I license in or license out, if I'm going to license in the technology from another company or university, I figure out what the value of that technology is for me and then I get a patent -- and I have a license agreement to the patent. What I don't want is that company to come back six months from now and, hey, say, look, I have a new patent on the same product and I want more money; right? And -- because I don't want to be in the position to keep -- you know, as they keep coming up with new patents providing more and more and more in royalties to them. So therefore, I want freedom to operate and -- and so I tell them for that underlying product, I don't care how many patents you have, I want access to all of them. But it's not like I'm going to pay anything more for them, because what I've already calculated is the value of the technology. **That's why in license agreements you'll see 100 patents or 120 patents. It doesn't mean that five patents are worth only a portion of it. That's because that's the value of the technology**, but I just want all of them thrown in there so that you can't come back and ask for more later.

---

[12]  would be reasonable at the hypothetical negotiation. Ex. 68 at 74:22-76:18, 81:6-84:8.

[13] Even if this Court were to exclude Mr. Nygren from offering a reasonable royalty opinion in this case, he should still be permitted as a percipient witness to testify regarding all the facts and circumstances regarding the many licenses he has negotiated and/or supervised, Välinge's 2G/5G-i licensing practices, and Välinge's 2G/5G-i technology. That is, at the very least, Mr. Nygren should be permitted to testify regarding facts, including the allegedly "inadmissible" facts highlighted by Defendants. *See* D.I. 306 at 41 n.13 (citing D.I. 307-3, Exs. 17-18).

Ex. 50 at 1022:11-1023:12 (emphasis added); *Sprint Commc'ns Co. v. Time Warner Cable, Inc.*, No. 2017-2247, 2018 WL 6266319, at *4 n.3 (Fed. Cir. Nov. 30, 2018) (affirming damages verdict where Dr. Rao relied on royalty rates from two agreements covering more than asserted patents); *see also* Ex. 68 at 37:15-40:4, 123:8-126:11, 130:11-133:20, 135:20-138:21.

Defendants' reliance on *AVM Technologies, LLC v. Intel Corp.*, No. 10-610-RGA, 2013 WL 126233 (D. Del. Jan. 4, 2013), is misplaced. As an initial matter, the licenses at issue in *AVM* did not even include the asserted patent in that case. *Id.* at *1. Moreover, the *AVM* court did not have evidence that the single asserted patent was the most important in AVM's applicable portfolio. *Id.* at *3. █████████████████████████████████████████████████ ████████████████████████████████████████████████ Ex. 1 ¶¶ 920-966; Ex. 2 ¶¶ 506-777; Ex. 68 at 128:25-129:25, 135:20-136:21. Moreover, Mr. Nygren's real-world analysis is entirely consistent with the *Georgia-Pacific* factors and the hypothetical negotiation framework. *See* Ex. 66 at 2-7, Ex. 67 at 2-5; Ex. 68 at 61:8-63:8, 65:13-75:22, 236:15-241:9. To the extent that Defendants disagree with Välinge's witnesses on these facts, such disputes go to weight, not to admissibility. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1295-96 (Fed. Cir. 2015) ("[T]he question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (holding that whether expert failed to properly disaggregate the value of unpatented services from a license agreement went "to the weight to be afforded the testimony and not its admissibility").

**B.   Justin McLean's Methodologies—Including His Conservative Analysis of the Distribution of Value in Välinge's Patent Portfolio—Are All Tied to the Facts of This Case**

Defendants' rhetoric aside, Justin McLean's opinions are not a "backup" to Mr. Nygren's opinions. D.I. 306 at 40. Nor do Mr. McLean's apportionment methodologies contradict Mr.

Nygren's. Ex. 51 at 135:19-136:12. It is "common for parties to choose different, reliable [damages] approaches in a single case." *Summit 6*, 802 F.3d at 1296. The Federal Circuit "has recognized that estimating a reasonable royalty is not an exact science," and "[t]he record may support a range of reasonable royalties, rather than a single value." *Id.* Similarly, "there may be more than one reliable method for estimating a reasonably royalty." *Id.* When multiple methodologies are used, "the relative strengths and weaknesses of each approach may be exposed at trial or attacked during cross-examination. That one approach may better account for one aspect of a royalty estimation does not make other approaches inadmissible." *Id.*

Defendants' *Daubert* attack against Mr. McLean's methodology—limited to his use of a study by Prof. Schankerman (D.I. 307-4 Ex. 20)—is unfounded. D.I. 306 at 44-50. Schankerman was only one of *several* methodologies that Mr. McLean relied on to reach his reasonable royalty opinion. Ex. 52 ¶¶ 168, 213-215; Ex. 53 ¶¶ 22-27. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Ex. 52 ¶¶ 138-139, 162-168, 183, 186, 213; Ex. 53 ¶ 27. Additionally, Mr. McLean's analysis of the ████████████████████████████████████████

████████████████████████████████████████████████ Ex. 52 ¶¶ 113-118, 121-123, 179-183, 191-194, 213-215; Ex. 53 ¶ 27. Mr. McLean's other methodologies do more than provide alternative paths to a reasonable royalty—they also confirm that his Schankerman analysis is in fact "sufficiently tied to the facts of the case." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993) (citation omitted). Indeed, the results of Mr. McLean's analysis using Schankerman (████████████████████████████████████████

██████████ ) is entirely consistent with the royalty rates suggested from his other analyses. Ex. 53 ¶ 27; Ex. 52 at McLean Exhibits 4, 11, 12, 15, 16.

But even standing alone, Mr. McLean's reliance on Schankerman is sufficiently tied to the specific facts of this case. "No one should doubt that the distribution of value in any patent portfolio will be skewed."[14] Here, Mr. McLean relied on the analysis of Dr. MacLean, ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ *See, e.g.*, Ex. 1 ¶¶ 920-966; Ex. 2 ¶¶ 506-777. While recognizing that, in the real world, Välinge would apportion its *entire* 2G/5G-i royalty rate to the patents-in-suit, Mr. McLean goes one step further and conservatively deducts value for the other Välinge patents by applying Schankerman's findings to the specifics of Välinge's 2G/5G-i portfolio in light of Dr. MacLean's technical findings.[15]

Mr. McLean relied on Schankerman's percentiles not only because they are widely cited and reliable, but also because they were more conservative than similar studies. For example, a study by Drs. Scherer and Harhoff found that the top 10 percent of U.S. patents[16] account for over 80 percent of the value among all patents in the field. Ex. 54. And Mr. McLean cites several

---

[14] *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *4-7 (N.D. Cal. Mar. 13, 2012) (denying *Daubert* motion to exclude damages opinions based on literature showing that the distribution of value among patents is highly skewed and also noting that the literature describing patent skewness is more consistent in describing the value in the top 20% than in describing the value of the top 1%).

[15] Specifically, Mr. McLean applies Schankerman's finding that within the mechanical technology field, the top 5 percent of patents accounted for 50 percent of the value among all patents in the field and the top 10 percent of patents accounted for at least 64 percent of the value in the field. Ex. 52 ¶ 82; *see also id.* at McLean Exhibits 4, 11, 12, 15, 16.

[16] To the extent that Defendants contend that Mr. McLean's reliance on Schankerman should be excluded because Schankerman considered French patents, Drs. Scherer and Harhoff suggest that the skew is even higher for U.S. patents. Ex. 54 at 560; Ex. 53 ¶ 23.

additional studies confirming the same skew phenomena in patent portfolios. *See* Ex. 52 ¶ 81 n.178; Ex. 53 ¶ 23 n.35.

Defendants contend that, because neither Schankerman nor other literature Mr. McLean reviewed specifically considers skews for U.S. patents in the flooring industry, Mr. McLean's methodology is unreliable. D.I. 306 at 44-48. But Defendants cannot dispute that the literature consistently shows skewness across multiple patent portfolios and technologies. ███████████ ████████████████████████████████████████████████ Several courts— including in this district—have allowed experts to apply Schankerman to value patents across different technologies and within a licensor's portfolio. *See, e.g.*, *In re Innovatio IP Ventures, LLC Patent Litig.*, MDL No. 2303, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013) (applying Schankerman to value 802.11 standard-essential U.S. patents); *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-cv-01735-H-RBB, 2016 WL 7644790, at *12 (S.D. Cal. Sept. 14, 2016) (refusing to strike expert's analysis applying Schankerman to value LTE Standard patents and holding that reliance on Schankerman was "not an arbitrary, general rule of thumb like the 25 percent rule or the Nash Bargaining Solution"); *LG Display Co. v. AU Optronics Corp.*, 722 F. Supp. 2d 466, 472-74 (D. Del. 2010) (holding that expert's reliance on Schankerman[17] to "count, rank, and divide" in determining value attributable to asserted patents related to liquid crystal displays based on the assumption that the asserted patents were in the top 5% of AU's portfolio was "credible and consistent with Federal Circuit case law and the *Georgia-Pacific* factors").

Defendants' attempts to distinguish *Innovatio* and *Odyssey* only highlight why courts have allowed damages experts to rely on Schankerman in valuing patents across multiple technologies. Indeed, Schankerman did not expressly consider skewness across 802.11 wireless

---

[17] *See* Ex. 57 ¶¶ 17 n.4, 67-68, Figs. 1, 3 (confirming that AU's expert, Dr. Putnam, relied on Schankerman).

and LTE portfolios. Nor did Schankerman expressly consider skewness across liquid crystal display portfolios. Nevertheless, *Innovatio*, *Odyssey*, and *LG Display* all appropriately allowed application of Schankerman's findings related to *electronic* portfolios generally. So too here, Mr. McLean appropriately applies Schankerman's findings related to *mechanical* portfolios to Välinge's 2G/5G-i portfolio, which is undoubtedly mechanical in nature. And while Defendants dispute the relevancy of Schankerman's findings to Välinge's 2G/5G-i portfolio, Defendants' attacks go to weight, not admissibility, especially where Mr. McLean's application of Schankerman provides a royalty range that is entirely consistent with his other methodologies and the facts here (i.e., confirming ███████████████████████████ and that Schankerman's findings for *mechanical* portfolios serves as a reasonable proxy here). *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("[D]isputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not [to] its admissibility."), *aff'd*, 564 U.S. 91 (2011).

## IV.    CONCLUSION

For the aforementioned reasons, Defendants' motions should be denied.

Dated: January 24, 2019

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 N. King Street

OF COUNSEL
Laura Masurovsky
Jason L. Romrell
Sydney Kestle
Finnegan, Henderson, Farabow,    Wilmington, DE 19801
 Garrett & Dunner, LLP            (302) 571-6600
901 New York Avenue, NW          apoff@ycst.com
Washington, DC 20001-4413        pkraman@ycst.com
(202) 408-4000
laura.masurovsky@finnegan.com    *Attorneys for Plaintiff*

*Välinge Innovation AB*

Daniel C. Cooley
Finnegan, Henderson, Farabow,
 Garrett & Dunner, LLP
Two Freedom Square
11955 Freedom Drive, Suite 800
Reston, VA 20190-5675
(571) 203-2700
daniel.cooley@finnegan.com

## CERTIFICATE OF SERVICE

I, Pilar G. Kraman, Esquire, hereby certify that on January 31, 2019, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to registered participants.

I further certify that on January 31, 2019, I caused the foregoing document to be served by e-mail on the following counsel of record:

Denise S. Kraft
Brian A. Biggs
DLA PIPER LLP (US)
1201 North Market Street
Suite 2100
Wilmington, DE 19801
*denise.kraft@dlapiper.com*
*brian.biggs@dlapiper.com*

Nicholas G. Papastavros
Michael Strapp
DLA PIPER LLP (US)
33 Arch Street
26th Floor
Boston, MA 02110-1447
*nick.papastavros@dlapiper.com*
*michael.strapp@dlapiper.com*

Peter Maggiore
Melissa Reinckens
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101
*peter.maggione@dlapiper.com*
*melissa.reinckens@dlapiper.com*

Aaron G. Fountain
DLA PIPER LLP (US)
401 Congress Avenue, Suite 2500
Austin, TX 78701-3799
*aaron.fountain@dlapiper.com*

*Attorneys for Defendants Halstead*
*New England Corp. and Home Depot U.S.A., Inc.*

Puja Patel Lea
Dustin B. Weeks
Ryan A. Schneider
TROUTMAN SANDERS LLP
600 Peachtree Street, NE Suite 3000
Atlanta, GA 30308
puja.lea@troutman.com
dustin.weeks@troutman.com
ryan.schneider@troutman.com

*Attorneys for Defendant Halstead*
*New England Corp*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
Adam W. Poff (No. 3990)
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
(302) 571-6600
*apoff@ycst.com*
*pkraman@ycst.com*

*Attorneys for Plaintiff*

Dated: January 31, 2019